**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Scott PAYNE, Defendant–Appellant.**

**No. 98–5197.**

United States Court of Appeals, Sixth Circuit.

Argued April 22, 1999,

Decided and Filed June 22, 1999.

Rehearing Denied Aug. 17, 1999.*

---

* Judge Kennedy adheres to her dissent.

James A. Earhart, Asst. U.S. Atty. (briefed), Terry M. Cushing (argued and briefed), Office of the U.S. Attorney, Louisville, Kentucky, for Appellee.

Scott C. Cox, Louisville, Kentucky, for Appellant. Scott C. Cox (argued and briefed), Louisville, Kentucky, for Appellant.

Scott N. Payne, pro se.

Before: KENNEDY, SILER, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which SILER, J., joined. KENNEDY, J. (pp. 791–94), delivered a separate dissenting opinion.

## KAREN NELSON MOORE, Circuit Judge.

Scott Payne appeals his convictions for possession of marijuana and illegal posses-sion of a firearm. The incriminating items were found by parole officers who, after arresting Payne for parole violations, per-formed what they called a "plain-view search" of Payne's home and vehicle. Al-though as a parolee Payne was subject to search on the basis of reasonable suspicion rather than probable cause, the parole offi-cers did not have sufficient evidence to satisfy even this reduced standard. They therefore lacked a valid legal reason to be in the places from which they observed the contraband, and we **REVERSE** the dis-trict court's denial of Payne's motion to suppress.

## I. BACKGROUND

Payne was paroled from Kentucky pris-on on June 1, 1994. His criminal history includes several felonies—such as robbery, escape, and assault on corrections offi-cers—as well as numerous parole viola-tions. Because of this history, he was placed under the maximum level of parole supervision, which meant he was required to have two office visits and one home visit with his parole officer each month. He agreed to a curfew and to random drug testing. He also signed a statement ac-knowledging that he was "subject to a search and seizure if my Probation and Parole Officer [has] reasonable suspicion to believe that I may have illegal contra-band on my person or property." J.A. at 235 (Conditions of Parole). After an initial June 2 meeting with his parole officer, Robert Burdette, in Barren County, Ken-tucky, Payne did not report for any more office visits, and no home visits took place.

Payne left Barren County and moved to Bowling Green. There, he attracted the attention of Detective Jerry Smith, a mem-ber of the Kentucky State Police Drug Enforcement–Special Investigations Unit ("DESI–West"). Smith received informa-tion sometime in August that Payne had a large quantity of methamphetamine in the trunk of his car. J.A. at 143 (Smith Test.). The record does not contain any informa-tion about the source of this tip. DESI–

West officers were unable to gather any more evidence to help establish probable cause for a search.

Some time around late August, Smith called Burdette. He told Burdette that Payne was living in Bowling Green and that he suspected him of being involved with drugs. Smith testified, "To be honest, I was a little frustrated that we had information that Scott Payne had a pound of methamphetamines, and I found out his probation/parole officer was in Barren County when I talked to him, he didn't seem too interested in checking into it. And that's why it took about a month and a half." J.A. at 157 (Smith Test.).

Burdette eventually confirmed that Payne was no longer living or working in Barren County. On September 23, he obtained an arrest warrant based on Payne's violation of the terms of his parole. He contacted Dan Duvall, a parole officer in Bowling Green, who agreed to perform the arrest. Burdette also told Duvall about his conversation with Smith. At some point the content of Smith's tip became exaggerated. Duvall testified that he believed Smith had information that Payne was dealing drugs from a trailer home. J.A. at 129 (Duvall Test.). The trailer belonged to and was the residence of Lisa Payne, Scott Payne's estranged wife. At the suppression hearing and on this appeal, the government and Payne's attorney have treated the trailer as Payne's residence. However, in a supplemental *pro se* brief, Payne points out that he actually lived in an apartment elsewhere in Bowling Green. He states that he visited the trailer only to see his children.

Parole officers often request help from police officers when serving an arrest warrant. They usually call on regular local police officers, but on occasion they call other agencies. In this case Duvall called DESI–West and invited Smith to help with Payne's arrest. On October 4, Duvall and two other parole officers met Smith and two other DESI–West officers at a shop-ping mall before the arrest. There, Duvall informed the drug officers of his intention "to do a plain-view search" of the trailer. J.A. at 121 (Duvall Test.). Lieutenant Wayne Mayfield, the ranking police officer at the scene, acknowledged that he "view[ed] this as an opportunity to have a probation/parole officer basically help [him] get in Mr. Payne's trailer." J.A. at 168 (Mayfield Test.).[1]

When the six officers arrived at the trailer, Payne's pickup truck was parked in front. There is a factual dispute over whether the driver's-side door was open or closed. The district court found that the door was closed. J.A. at 104 (Dist.Ct.Op.) (stating that two of the officers opened the door).

Smith and two other officers went to the front door. When Lisa Payne answered the door, she denied that Scott Payne was in the trailer. Smith heard a noise from the left end of the trailer, so he moved down the hallway to conduct a protective sweep of the trailer. He found Scott Payne hiding behind a door in the left-side bedroom, holding a glass of tea. Payne was handcuffed and placed in a car. At this point, the police and parole officers felt that their safety was assured.

After Payne had been put in the car, Duvall entered the trailer to conduct his "plain-view search." In the right-side bedroom, he saw an ashtray containing what appeared to be a marijuana cigarette. He gave it to Smith.

In the meantime, Russell McElroy, another parole officer at the scene, had made a discovery in Payne's pickup truck. McElroy is under the impression that he and his colleagues have the authority to search the persons and homes of parolees at any time. When asked at the suppression hearing to define "reasonable suspicion," he responded, "Just my own personal feelings." J.A. at 207 (McElroy Test.). McElroy testified that the doors on the

---

1. This quotation is from a question to which Mayfield responded, "Yes, sir."

pickup truck were closed but the driver's-side window was open. He put his head through the window and leaned forward so he could see the door handle. J.A. at 209 (McElroy Test.).[2] There, he saw what he suspected was a marijuana cigarette, a roach clip, and rolling papers. He and one of the DESI–West officers opened the door and pushed the seat forward. Behind the seat, they found a box of what he thought were shotgun shells and a black case that turned out to contain digital scales. It is unclear who removed and opened the case.

The parole officers left with Payne, and two of the DESI–West officers went to get a search warrant. They used the marijuana cigarette from the bedroom and the scales from the truck to establish probable cause to search both the truck and the trailer. Mayfield stayed to secure the trailer, which meant following Lisa Payne around to make sure she did not destroy any contraband. Eventually, in exchange for permission for her children to use the bathroom, she produced cash, a handgun, and what turned out to be methamphetamine from a closet in the right-side bedroom. When the other officers returned with the search warrant, they found an assault rifle and various gun paraphernalia in the same bedroom. Some of the items—a holster, a box of shells, and a gun-cleaning kit—were in a bag that also contained a jacket belonging to Scott Payne. In the truck, the officers found a handgun inside a carrying case. In addition, Lisa Payne consented to a search of her car, which contained no contraband.

Payne was charged in federal court with possessing methamphetamine with intent to distribute, possessing marijuana, and being a felon in receipt of firearms. The district court denied Payne's motion to suppress, holding that the initial searches were supported by reasonable suspicion. At trial, Payne's lawyer conceded that the marijuana in the truck belonged to Payne and essentially told the jury to convict on that count. He then put on evidence that the methamphetamine and weapons in the trailer belonged to Lisa. A friend of Payne's testified that the gun found in the truck was his and that he had forgotten it there after taking a trip with Payne. Several witnesses testified that Payne used the digital scales to balance engine parts when he fixed motorcycles, which he did for a living. Payne was acquitted on the count for possession with intent to distribute methamphetamine and convicted on the other two counts. He was sentenced to 264 months in prison.

## II. ANALYSIS

### A. REASONABLE SUSPICION

■ Although we may disturb the district court's findings of historical fact only if they are clearly erroneous, we review de novo the ultimate question of whether the search was supported by reasonable suspicion. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

### 1. Standard

■ A state's rules governing the terms of parole may infringe on constitutionally

---

2. Smith and Duvall testified that the door was open when they arrived. J.A. at 127 (Duvall Test.), 159 (Smith Test.); 10/27/97 Tr. at 33–34 (Duvall Test.). Their written reports also referred to the door being open, as did McElroy's. J.A. at 182–83 (Mayfield Test.), 215 (McElroy Test.). After McElroy testified that it was closed, the government pointed out that the statement in his report. McElroy stated that he must be mistaken because the report should be correct. J.A. at 215 (McElroy Test.). However, the report did not seem to refresh his memory until the trial, where he testified, "In reviewing my notes, I saw that the truck door was open." 10/27/97 Tr. at 43 (McElroy Test.).

The district court apparently credited McElroy's initial testimony that the door was closed. J.A. at 104 (Dist.Ct.Op.). McElroy's detailed memory of sticking his head through the window is quite believable; in contrast, Smith and Duvall were doing other things while McElroy was looking in the truck.

protected liberties as long as the rules are reasonably related to the purposes of parole. *See United States v. Holloway*, 740 F.2d 1373, 1383 (6th Cir.) (stating this rule with respect to probation and noting the dual goals of probation of rehabilitating the defendant and protecting the public), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984). The Supreme Court held in *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), that a state may provide by law for searches of parolees and their property, including their homes, on less than probable cause.

■ *Griffin* was a direct appeal from a state-court conviction. The Supreme Court upheld a Wisconsin regulation that subjected parolees to searches upon "reasonable grounds" to suspect the presence of contraband. In upholding this regulation, the Court did not specify the lower bounds of its holding. For example, the Court did not expressly decide whether a state law may provide for searches of parolees at any time, for any or no reason. *See United States v. McFarland*, 116 F.3d 316, 317–18 (8th Cir.1997) (noting that California has adopted such a policy); *but see Griffin*, 483 U.S. at 875, 107 S.Ct. 3164 (stating that the permissible degree of infringement on a parolee's privacy is "not unlimited"). The Court did, however, defer entirely to the state court's determination that the state-law standard was satisfied by an officer's having "received information from a detective ... that there were or might be guns in Griffin's apartment." *Griffin*, 483 U.S. at 876, 107 S.Ct. 3164. Whether the search was based on "reasonable grounds" was, in the Court's view, purely a matter of state law. Because the Court declined to review the determination of "reasonable grounds" despite the sparseness of the evidence to support the state court's ruling, *Griffin*

appears to leave open the possibility that a state may choose a different or lower standard than the federal standard for reasonable suspicion. *See United States v. Conway*, 122 F.3d 841, 843–44 (9th Cir. 1997) (Wallace, J., concurring), *cert. denied*, —— U.S. ——, 118 S.Ct. 730, 139 L.Ed.2d 668 (1998).[3] Whether or not this is the case, it is clear that a state statute authorizing searches of parolees on grounds that satisfy the federal standard for reasonable suspicion would be constitutional.

■ Pursuant to statutory authority, *see* KY.REV.STAT. ANN. § 439.470 (Banks–Baldwin 1988 & Supp.1997), the Kentucky parole commissioner has issued a policy which authorizes a parole officer to search the person and property of a parolee, without a warrant, upon reasonable suspicion that the parolee is in possession of contraband. *See* Corrections Policies and Procedures 27–16–01 (issued May 5, 1989), *incorporated by reference in* 501 KY. ADMIN. REGS. 6:020 (1998). Unlike the Supreme Court in *Griffin*, we are without the benefit of a state court's interpretation of this standard and application of it to the facts of this case. In addition, the Kentucky policy does not provide as much guidance to officers in the field as the regulation upheld in *Griffin* did. *See Griffin*, 483 U.S. at 870–71, 107 S.Ct. 3164 (summarizing factors prescribed by the Wisconsin regulation). However, the policy appears to adopt the federal definition of reasonable suspicion. Its definition of "reasonable suspicion" uses phrases familiar from federal case law:

> Less stringent a standard than probable cause, reasonable suspicion requires that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief

---

**3.** Alternatively, the Court may have heard *Griffin* solely to determine whether a "reasonable suspicion" standard could be applied to parolees. In other words, the Court may not

have seen the grant of certiorari as extending to the issue of whether there was reasonable suspicion in the particular case.

that a condition of probation or parole has been or is being violated.

Pol'y 27–16–01 at 1.

■ As we discuss below, the policy's ability to channel the discretion of officers in the field is important to the determination that searches conducted pursuant to the policy are reasonable under the Fourth Amendment. Duvall and McElroy's beliefs about their authority suggest that the goal of channeling their discretion has not been achieved.[4] However, although the text of the Kentucky policy itself provides less guidance than the regulation upheld in *Griffin*, we believe the apparent incorporation of federal case law is sufficient to make the policy constitutional. Duvall and McElroy's misconceptions reflect flaws not in the policy itself but in their own understanding of it. Because the Kentucky policy is sufficiently specific and adopts a standard that is at least as demanding as the standard upheld in *Griffin*, it is constitutional.

## 2. Exclusionary Rule

■ The parties have assumed throughout that if the officers lacked reasonable suspicion for the search, the fruits of the search must be suppressed. We agree. In general, a violation of a more restrictive state law does not require suppression in a federal proceeding, *see United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir.1994), but in this case a violation of the state policy would also be a violation of the Fourth Amendment.

■ The search in *Griffin* was constitutional "because it was carried out pursuant to a regulation that itself satisfie[d] the Fourth Amendment's reasonableness requirement." *Griffin*, 483 U.S. at 873, 107 S.Ct. 3164. In the context of the special needs of the parole system, the presence of a reasonable regulatory scheme can make a search upon less than probable cause "reasonable" for purposes of the Fourth Amendment. *See id.* at 873, 107 S.Ct. 3164 (noting "that in certain circumstances government investigators conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards'") (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)); *see also New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (upholding a statute authorizing warrantless administrative searches of vehicle dismantling businesses); *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (upholding warrantless mine inspections). A search not authorized by the regulatory scheme is unreasonable unless it independently satisfies traditional Fourth Amendment requirements. *Cf. Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) ("Where Congress has authorized inspection but made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply."). The "special needs" of the parole system would likely affect those requirements even in the absence of a regulatory scheme. *See Griffin*, 483 U.S. at 873–75, 107 S.Ct. 3164 (discuss-

---

4. We have already noted McElroy's views on "reasonable suspicion." *See supra* p. 784. Duvall's notion of a planned "plain-view search" indicates an equally disturbing misunderstanding of the Fourth Amendment's restraints on government power. *See Horton v. California*, 496 U.S. 128, 130, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (stating that inadvertence, although not required, "is a characteristic of most legitimate 'plain-view' *seizures* ") (emphasis added). There is no such thing as a "plain-view search." *See Texas v. Brown*, 460 U.S. 730, 738–39, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (" '[P]lain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment. 'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be.") (footnote omitted).

ing the special needs of a probation system); *see also O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (holding that government employers may search employees' offices without probable cause); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (holding that public school officials may search students upon reasonable suspicion rather than probable cause). However, we would at minimum require that a search conducted without statutory authorization meet the federal standard of reasonable suspicion,[5] which in this case is equivalent to the state-law standard. Thus, if the search in this case was not based on a reasonable suspicion, then it violated both Kentucky law and the Fourth Amendment.

▮ We also believe that application of the exclusionary rule is appropriate in these circumstances. There are some contexts in which the deterrence value of the exclusionary rule is too slight to require that evidence obtained in violation of the Fourth Amendment be suppressed. We have held that the nature of the proceeding is the most important factor in determining whether the exclusionary rule should apply. *See Wolf v. Commissioner*, 13 F.3d 189, 194 (6th Cir.1993). In *Wolf*, we held that the deterrence effect was too attenuated to justify applying the exclusionary rule in a civil tax proceeding, when the evidence in question was obtained through a criminal investigation of drug activity. Criminal proceedings are, of course, the realm in which the exclusionary rule is strongest. *See id.* at 193 (noting that "the applicability of the exclusionary rule to state and federal criminal proceedings already deter[s] Fourth Amendment violations").

▮ Another consideration is whether the proceeding falls within the "zone of primary interest" of the government officials who committed the violation. *See id.* In this case, the search was conducted primarily by parole officers, whose zone of interest is distinct from, but overlaps with, an interest in enforcing the drug laws. Although the parole officer is interested in the parolee's rehabilitation, the officer is also charged with monitoring compliance with various restrictions, including restrictions on the use of drugs. As in this case, parole officers often work closely with the police. Exempting evidence illegally obtained by a parole officer from the exclusionary rule would greatly increase the temptation to use the parole officer's broad authority to circumvent the Fourth Amendment. We therefore hold that evidence obtained by a parole officer in violation of the Fourth Amendment must be suppressed in a subsequent criminal proceeding.

### 3. Application

▮ Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring "articulable reasons" and "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

▮ The facts on which the government relies for reasonable suspicion in this case come down to the following:

5. When the Supreme Court has held that, because of "special needs," less-than-probable-cause searches are "reasonable" in the absence of a detailed regulatory scheme, it has imposed the reasonable suspicion standard. *See O'Connor*, 480 U.S. at 725–26, 107 S.Ct. 1492 (citing *T.L.O.* and *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. 733. Even assuming that a state is free to create a different or lesser standard, we are not inclined to fashion yet another federal constitutional level of suspicion, something more than a vague hunch yet less than "reasonable suspicion" as we now understand it. *Cf. United States v. Montoya de Hernandez*, 473 U.S. 531, 540–41, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (rejecting lower court's attempt to create a new level of suspicion between "probable cause" and "reasonable suspicion").

(1) Duvall knew Payne's criminal history, which included guilty pleas to a misdemeanor drug charge for possessing a small amount of marijuana and a felony charge for possessing Alprazolam and Diazepam. J.A. at 251, 255(PSR). Both drug offenses occurred while Payne was in prison.

(2) Smith had received a tip that Payne had been in possession of a large amount of methamphetamine about six weeks earlier.

(3) Payne had absconded from supervision by moving to a different county and leaving his job without reporting to his parole officer.

(4) Payne hid from the officers when they came to arrest him.

The district court held that these facts provided "a sufficient basis for the parole officers reasonably to infer that Payne did not' want them to know his whereabouts because he was again involved in criminal activity." J.A. at 107 (Dist.Ct.Op.). In concluding that Duvall had a reasonable suspicion that the search would reveal drugs, the district court relied on *Griffin*, where the search was based on information that there "were or might be" guns in the defendant's apartment.

The district court's reliance' on *Griffin* was misplaced. As we have discussed, the Supreme Court did not hold that the "were or might be" tip established reasonable suspicion; it merely deferred to a state court's application of a state-law standard. Because the Court did not conduct its own analysis of the facts in *Griffin*, and because the state's standard in that case may well differ from the federal reasonable suspicion standard, *Griffin* does not guide our application of the reasonable suspicion standard. Rather, we look to the Court's cases dealing explicitly with the reasonable suspicion standard and the criteria for evaluating the reliability of tips received by the police. The tip in this case lacked any of the traditional indicia of reliability identified in those cases, and it was stale.

It was clearly insufficient to create a reasonable suspicion.

We first note how the tip became garbled as it passed from Smith to Burdette to Duvall. Smith reported a tip that Payne had a large quantity of methamphetamine in the trunk of his car at some point in August. J.A. at 143 (Smith Test.). By the time this information reached Duvall, it had become a tip that "Payne was dealing illegal drugs out of the trailer." J.A. at 129 (Duvall Test.). Whether there was reasonable suspicion depends on the actual content of the tip Smith received, not what Duvall subjectively believed the information to be. *Cf. Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.").

The Supreme Court has dealt most extensively with tips in contexts where probable cause is the governing standard. For many years, the Court applied the two-prong *Aguilar–Spinelli* test, which examined (1) the basis of the informant's knowledge and (2) the veracity of the informant. The first prong refers to the circumstances under which the informant obtained the information. The second prong considers the circumstances that led the officer to believe the informant was reliable. If these tests were not satisfied, a court would consider whether the government was able to corroborate the tip in order to supply the necessary indicia of reliability and credibility. *See United States v. Jordon*, 530 F.2d 722, 724 (6th Cir.1976) (per curiam) (summarizing *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). The Supreme Court has abandoned the formal, two-pronged *Aguilar–Spinelli* test in favor of a "totality of the circumstances" approach. *See Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (citing *Illinois v.*

*Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). However, the factors identified in *Aguilar* and *Spinelli* are still "highly relevant." *White*, 496 U.S. at 328, 110 S.Ct. 2412.

Courts analyzing searches under the reasonable suspicion standard use the same factors but require a less demanding showing than when applying a probable cause standard. *See White*, 496 U.S. at 328–29, 110 S.Ct. 2412. For example, courts have been willing to find reasonable suspicion based on either the government's having corroborated some aspects of a detailed tip *or* the informant's having a proven track record of providing reliable information. *See, e.g., White*, 496 U.S. at 331–32, 110 S.Ct. 2412 (holding that reasonable suspicion existed based on a detailed anonymous tip that was corroborated, even though the corroborating evidence was of innocent activities); *Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (holding that a known informant's on-the-spot tip about a gun in a suspect's waistband established reasonable suspicion for officer to reach into suspect's car and remove the gun); *United States v. Lewis*, 71 F.3d 358 (10th Cir. 1995) (holding that a search of a parolee's home was justified by a well-known informant's tip that the parolee was trafficking in drugs).

The tip in this case had none of the indicia of reliability that courts traditionally examine. It was, so far as the record reveals, anonymous. It lacked detail and failed to predict any future events that could be monitored to provide corroboration. *See White*, 496 U.S. at 332, 110 S.Ct. 2412 (stressing informant's success in predicting suspect's actions). Even the minimal detail it provided—that the drugs were in the trunk of Payne's car—suggests unreliability, since although Lisa Payne drives a car, Scott Payne drives a pickup truck.[6] A tip so lacking in indicia of reliability "would either warrant no police re-

sponse or require further investigation." *Williams*, 407 U.S. at 147, 92 S.Ct. 1921. Recognizing this, Smith and the other officers at DESI–West spent a month or two looking for corroborating evidence and found none. "[F]rom the government's failure to produce a single item of evidence from [its investigation] in support of founded suspicion, the only rational inference [is] that the informant was unreliable." *United States v. Devita*, 526 F.2d 81, 83 (9th Cir.1975).

Even if the tip had been somewhat reliable at the time Smith received it, it was stale by the time of the search. Drugs are not the types of objects that are likely to be kept, and, contrary to Duvall's impression, the tip contained no indication of ongoing activity. *Cf. United States v. Akram*, 165 F.3d 452, 456–57 (6th Cir.1999) (discussing the staleness doctrine in the probable cause context). In this respect, the search here was even less justifiable than the search in *Griffin*. In that case, although the tip appears to have been similarly lacking in most indicia of reliability, the search at least occurred while the tip was still fresh. *See Griffin*, 483 U.S. at 871, 107 S.Ct. 3164. And, to reiterate, the tip in this case was for a car, not the trailer or Payne's truck.

Even a less-than-reliable tip may add something to the totality of the circumstances for determining reasonable suspicion. Here, Duvall had the additional information that Payne had absconded from supervision and had committed drug crimes in the past. Payne had a long and consistent history of violating parole. In contrast, his past drug offenses—both occurring while he was imprisoned—were quite different from the one alleged in the tip. A person reviewing Payne's record could have predicted that he would violate parole again and could have been almost as confident that he would cause some kind of trouble. But a person's criminal

6. Obviously, Scott could have borrowed Lisa's car, but it is also possible—and consistent with the jury's verdict—that the methamphetamine belonged to Lisa.

record alone does not justify a search of his or her home, and the tip in this case adds so little that it does not reach the level of reasonable suspicion.

## B. PAYNE'S ALTERNATIVE ARGUMENTS

Payne argues in the alternative that even if there was reasonable suspicion for a search, the evidence should be excluded because Duvall's authority as a parole officer was used to circumvent the probable cause requirement that DESI–West could not satisfy. In addition, Payne raises several challenges to the search and his conviction in the supplemental *pro se* brief that he filed just before oral argument. Because we hold that all of the incriminating evidence must be excluded because of the lack of reasonable suspicion, we need not address these alternative arguments. Finally, we note that the government has correctly refrained from arguing that the evidence was properly seized under the plain-view doctrine, acknowledging that without reasonable suspicion there was never a justification for the officers to be in the places from which they observed the incriminating items. *See United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 324, 139 L.Ed.2d 250 (1997) (stating this requirement of the plain-view doctrine); *see also Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (describing requirements for a "protective sweep"); *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (describing the limits of a search incident to arrest).

## III. CONCLUSION

Because the searches of the trailer and Payne's truck were not justified by a reasonable suspicion that he possessed contraband, the fruits of these searches are inadmissible. Because Lisa Payne's revelation of some of the contraband was induced by the continuing police presence in the trailer and because the search warrant was obtained on the basis of illegally seized evidence, these later discoveries are also inadmissible. We therefore **REVERSE** the district court's denial of Payne's motion to suppress and **REMAND** this case for further proceedings consistent with this opinion.

KENNEDY, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion. I agree with the district court that this search by the state parole officer did not violate the Constitution. In *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Supreme Court outlined how courts should analyze searches of probationers and parolees and their property under the Fourth Amendment. *Griffin* concerned the search of a *probationer's* home, but subsequent courts have analyzed searches of *parolees'* homes, like the search here, under the *Griffin* approach. *See, e.g., United States v. Jones*, 152 F.3d 680, 684–87 (7th Cir.1998). Because I believe that the search here is permissible under the probationer standard, I need not analyze whether parolees receive less Fourth Amendment protection than probationers. *See Jones*, 152 F.3d at 684 n. 3.

In *Griffin*, the Court stated its holding as "[t]he search of Griffin's home satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles." 483 U.S. at 873, 107 S.Ct. 3164. I think the *Griffin* Court describes a two-step analysis: (1) whether the regulation pursuant to which the search was carried out satisfies the Fourth Amendment reasonableness requirement and (2) whether the facts of the search itself satisfy that regulation. *See United States v. Conway*, 122 F.3d 841, 842–43 (9th Cir.1997) (analyzing first whether Washington state's scheme satisfied *Griffin* and then analyzing whether the probation officer possessed the "reasonable cause" required by Washington

law). Analysis of both of these steps is more complicated in the instant case than it was in *Griffin*, because in the instant case the state court has not defined the scope of its regulation. In *Griffin*, which was an appeal from the Wisconsin Supreme Court, the Supreme Court could and did defer to the state supreme court's holding that its regulation was satisfied. In this case, we have neither a state court determination in this exact case that its regulation was or was not satisfied nor a state court decision in *any* case involving this policy to guide our determination. Determining that scope is necessary for an analysis of both of the steps described above. However, the policy is a written one and I believe we can make the decision whether it meets the standard of *Griffin*. Below, I first analyze the Kentucky policy at question and then turn to the two steps.

My reading of the policy leads to the conclusion that it authorizes searches of parolees[1], at least where a parole officer has a "reasonable suspicion" to believe that the parolee is in possession of contraband. In a part of the policy entitled "VI. Procedures," the policy provides in relevant part as follows:

A. Search

When an officer has reasonable suspicion to believe that a client or other person under the jurisdiction of the Corrections Cabinet is in possession of contraband, the officer may conduct an investigation and search to validate the suspicion or information received....

1. Warrantless Search

a. When reasonable suspicion exists to believe that a client is violating a condition of probation or parole or exigent or emergency circumstances exist, a probation and parole officer may search without a warrant.

b. [describing exigent circumstances that justify searching without a warrant].

Policy at *3. A conflict exists between the text immediately following A., which requires reasonable suspicion that the parolee possesses contraband in order to search, and A.1.a., which requires reasonable suspicion only that the parolee is violating a condition of parole. I think an additional fact tips the balance in favor of interpreting the Kentucky policy as authorizing searches where there is reasonable suspicion that the parolee possesses contraband, although there may not be where the reasonable suspicion relates to violation of some other condition of parole. The conditions of supervision given to Payne provide that he agrees. to be searched if his parole officer has reasonable suspicion to believe that Payne possesses contraband on his person or property. This apparently standard language provides some indication that Kentucky views its policy as authorizing searches where there is reasonable suspicion that Payne possesses contraband.[2]

The next interpretive task is to discern the meaning of "reasonable suspicion" under the Kentucky policy. It defines "reasonable suspicion" as "[l]ess stringent a standard than probable cause, reasonable suspicion requires that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, rea-

---

1. The policy also covers searches of probationers and its substance does not differ for probationers. Because the defendant here is a parolee, I will only refer to parolees.

2. I have concluded here that Kentucky did not authorize searches of parolees based on a reasonable suspicion that the parolee violated a condition of parole; I am not saying that Kentucky could not authorize warrantless searches of parolees based on reasonable

suspicion that the parolee has violated a condition of parole only that it did not. My construction of Kentucky's policy makes it unnecessary to reach that issue. *Cf. Conway,* 122 F.3d at 842 (upholding search of probationer pursuant to Washington state law authorizing searches "[i]f there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence").

sonably warrant a belief that a condition of probation or parole has been or is being violated."[3]  Policy at *1. As noted above, Kentucky courts have not passed on the meaning of this language.

To fill this gap, the majority reasons that "the policy appears to adopt the federal definition of reasonable suspicion" because "[i]ts definition of 'reasonable suspicion' uses phrases familiar from federal case law." Majority opinion at 786. I, on the other hand, believe that the policy at issue, which Kentucky adopted, effective May 1989, a little less than two years after the Supreme Court's *Griffin* decision, was intended to incorporate the same "reasonable suspicion" standard and to have the same substantive meaning as the "reasonable grounds" standard that the Court upheld in *Griffin*.[4]

With that construction of Kentucky law, I move to the second step of the analysis—whether, under Kentucky law, the parole officer here had a reasonable suspicion that Payne was in possession of contraband.[5]  I think the facts of this case do create a reasonable suspicion that Payne possessed contraband.  Some six weeks earlier, Payne's parole officer received a report from Detective Smith that Payne had a large amount of methamphetamine in the trunk of his car and that Payne was living in a different location than the one he had provided to his parole officer.  Prior to the search, Payne's parole officer

confirmed that Payne was no longer working at his previous place of employment.  Payne had not advised · his parole officer that he was no longer employed.  Payne's parole officer confirmed that Payne was no longer living in the county that he was limited to as a condition of parole.  Payne also had failed to report as required by his parole conditions.  Taken together, I think the facts of this case have equal weight to those in *Griffin*, where the Wisconsin Supreme Court concluded that a tip that the probationer "had" or "may have had" an illegal weapon constituted reasonable grounds.  The basis of the knowledge of the officer who gave the tip was unknown.  *See* 483 U.S. at 875, 107 S.Ct. 3164 (describing Wisconsin Supreme Court holding).  Although the tip here was older—six weeks had passed before the search occurred, the tip here was not qualified ("has or may have") like the tip in *Griffin*.  The evidence that Payne had absconded from supervision also strengthens the inference that Payne was involved in illegal activities and supports the parole officer's conclusion that he had reasonable suspicion to conclude that Payne may possess contraband.  In *Griffin*, the probationer had not absconded.  For these reasons, I think that under the totality of these facts, Payne's parole officer had reasonable suspicion that Payne possessed contraband, and thus under Kentucky law, the search was proper.

**3.** This definition provides some support for the conclusion that a Kentucky parole officer can search a parolee's home if the parole officer has a reasonable suspicion that the parolee has violated a condition of parole, rather than a more narrow requirement that a parole officer have a reasonable suspicion that the parolee has violated the condition of parole regarding possession of contraband.  I do not think this tips the balance away from my conclusion stated above.

**4.** This is not to say that the Supreme Court in *Griffin* independently analyzed the meaning of the "reasonable grounds" standard under Wisconsin law.  The Court made it clear that it did not independently analyze the meaning of the "reasonable grounds" standard.  Specifically, the Court stated that "the Wisconsin

Supreme Court—the ultimate authority on issues of Wisconsin law—has held that a tip from a police detective that Griffin 'had' or 'may have had' an illegal weapon at his home constituted the requisite 'reasonable grounds.'  Whether or not we would choose to interpret a similarly worded federal regulation in that fashion, we are bound by the state court's interpretation, which is relevant to our constitutional analysis only ·insofar as it fixes the meaning of the regulation."  483 U.S. at 875, 107 S.Ct. 3164 (citation omitted).

**5.** *Griffin* did not need to perform this step of the analysis because the Wisconsin Supreme Court had already done it since *Griffin* was a direct appeal from the Wisconsin Supreme Court's decision.

794

The suspicion is not limited, as the Majority limits it, to possession of the particular methamphetamine observed six weeks earlier but rather that a parolee who has moved, left his employment, has not been reporting and has been seen in possession of drugs is likely to be in possession of drugs.

Even if the majority is correct that Kentucky chose to borrow the federal case law defining reasonable suspicion, I do not think that the reasonable suspicion cases relied on by the majority, none of which involve searches of parolees and probationers, can be transferred directly to the context of a search of a parolee. While the tip here alone would not suffice to establish reasonable suspicion to, for example, stop a non-parolee six weeks after receiving the tip, that does not mean that the tip combined with the other facts noted above would not be enough in the parole context. The majority's analysis focuses on the tip and compares it to cases that do not involve parolees with prior drug convictions (albeit for possession charges that occurred while in prison) who have absconded from supervision and are known not to be employed. In my opinion, the strength of the tip necessary to establish a parole officer's reasonable suspicion that a parolee with two convictions for drug offenses who has absconded is less than if the tip concerns an ordinary citizen. As the Court noted in *Griffin*,

> For the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search.

*Griffin*, 483 U.S. at 880, 107 S.Ct. 3164. I would find that reasonable suspicion exists here even if the majority is correct that the Kentucky policy incorporates the federal reasonable suspicion standard.

For the foregoing reasons, I respectfully dissent.