*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

                                                    No. 11-5925

        *v.*

ROBIN PERRY,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:09-cr-20324-1—Samuel H. Mays, Jr., District Judge.

Argued: July 26, 2012

Decided and Filed: January 9, 2013

Before: ROGERS and KETHLEDGE, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David M. Bell, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. R. Matthew Price, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** David M. Bell, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. R. Matthew Price, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

    KETHLEDGE, Circuit Judge. Robin Perry pled guilty to being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g). She challenges the denial of her

_____

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

motion to suppress a gun found in her apartment.  She also challenges her sentence.  We affirm.

I.

Fred Tibbs returned home from work just after 5:30 a.m. one morning in January 2009.  He lived in a room in a boarding house.  Another boarder was Robin Perry, a convicted felon who knocked on Tibbs's door four times that morning after he got home.  The first time, Perry asked for cigarettes and liquor; the second, for an ironing board; the third time, she invited Tibbs to join her in her room for coffee (he refused); and the fourth time, Perry brought a revolver, which she pointed at Tibbs's head.  He shut the door and called the police.  Perry left the house before they arrived.

Perry returned to the boarding house at 9 p.m. that night.  Her landlord, Leon Freeman, confronted her as she walked in, saying that he had gotten complaints about her pointing a gun at people and that she needed to move out.  She denied pointing a gun at anyone, but threatened to do just that as she walked upstairs.  Minutes later, Perry pointed her gun at another resident, Reginald Dancy, and demanded to know whether he had called the police about her.  Dancy insisted that he had not, retreating into his room.  Perry forced herself into the room and threatened to kill him.  Finally she left the room without incident.  By then the police were on their way.

Officers Guy Hendree and Bob Parker responded to the call.  Upon arriving, they spoke with Tibbs, Freeman, and Dancy; then they headed up the stairs towards Perry's room.  Hendree racked his shotgun and Parker drew his pistol on the way up.  At the top of the stairs, they found Perry in the hallway.  The officers ordered her to put her hands up.  She complied.  Hendree slung the shotgun onto his back; Parker holstered his pistol.  The officers then ordered Perry against the wall, patted her down, and handcuffed her.

The officers asked Perry if she had a gun.  She said no, and volunteered that she had been drinking.  Perry's room was nearby, with the door open.  The officers asked for Perry's consent to search the room.  According to several witnesses, she gave consent.  Parker then entered the room and "almost immediately" called for Hendree, who entered

and saw a revolver sticking out from under a pillow on Perry's bed.  The officers seized the gun and arrested Perry.  Hendree later prepared a report on the arrest, in which he said that he had found the gun during a "protective sweep" of the room.  He did not mention Perry's consent to enter.

The government thereafter charged Perry with being a felon in possession of a firearm.  She filed a motion to suppress the revolver, arguing that it was obtained pursuant to an illegal search.  A magistrate judge held a suppression hearing and recommended that the district court deny the motion.  The district court adopted the recommendation, finding that Perry consented to the search voluntarily and that, in any event, the police were entitled to conduct a protective sweep.

Perry then entered a conditional guilty plea, reserving her right to appeal the denial of her suppression motion.  Perry's presentence report, prepared by a probation officer, said that she was subject to a mandatory-minimum sentence of 15 years under the Armed Career Criminal Act because she had three prior convictions for violent felonies or serious drug offenses.  *See generally* 18 U.S.C. § 924(e)(1).  Among the prior violent felonies, according to the report, was a 2001 conviction for aggravated assault in violation of Ohio Revised Code § 2903.12.  At sentencing, Perry disputed that the 2001 aggravated-assault conviction qualified as a "violent felony" under 18 U.S.C. § 924(e).  The district court rejected her argument and sentenced her to the mandatory minimum of 15 years' imprisonment.

This appeal followed.

II.

A.

Perry challenges the denial of her suppression motion, arguing on several grounds that she did not consent to the search of her apartment. We review the district court's finding on this point for clear error, viewing the evidence in the light most favorable to the government. *See United States v. Marrero*, 651 F.3d 453, 468 (6th Cir. 2011).

Perry argues that the government's evidence is insufficient to show that she consented to the search of her room. To that end, she points out that she never signed a consent-to-search form, that Officer Hendree never mentioned her consent in the post-arrest report (instead he said they had conducted a protective sweep), and that various witnesses gave inconsistent accounts of the circumstances surrounding her consent. But most of those inconsistencies were immaterial: whether the gun was black or grey, whether two people (or just one) were upstairs with Perry when the police arrived, whether the officers asked for consent or Perry volunteered it, and so on. It is true that Tibbs's testimony was ambiguous as to whether Perry affirmatively consented to the search of her room, or merely remained silent when the police asked to enter. But three other witnesses—Hendree, Parker, and Dancy—testified that Perry consented. The district court did not clearly err in crediting their testimony.

Perry argues alternatively that her consent was involuntary. *See generally Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007). In her view, several circumstances vitiated her consent: that she was handcuffed when she gave it, that the police were armed, that the police never told her that she could decline to consent, and that she was drunk at the time. But other facts supported the district court's finding that Perry's consent was voluntary. Perry was "no stranger to the police or the criminal justice system," *United States v. Canipe*, 569 F.3d 597, 604 (6th Cir. 2009) (quotation marks omitted), since she had been arrested—and thus presumably handcuffed—at least 57 times before. Her encounter with the officers in the hallway was brief, without any repeated questioning or physical abuse. *See United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995). And none of the facts she cites compels a finding that her consent was involuntary. *See, e.g.*, *United States v. Burns*, 298 F.3d 523, 541 (6th Cir. 2002) (handcuffs did not render consent involuntary); *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005) (consent voluntary even though officers were armed); *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010) (intoxication does not necessarily make consent involuntary). Thus, the district court did not clearly err in concluding that Perry's consent was voluntary. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

But Perry says that two cases require reversal here.  The first is *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999).  That case involved an airport stop in which the officers requested consent to search and Worley responded, "You've got the badge, I guess you can."  *Id*. at 386.  The officers then searched Worley and found drugs.  Thereafter the district court found that Worley had not in fact consented to the search, reasoning that Worley's response expressed a sense of futility rather than consent.  This court affirmed.  *Id.*  But Perry's case differs from Worley's in two fundamental respects.  First, on the facts as found by the district court, Perry *did* unequivocally consent to the search, rather than simply acquiesce in terms reflecting futility, as Worley did.  And second, in *Worley* our standard of review favored the defendant, since the district court had granted his motion to suppress.  Here, the standard favors the government; and we see no greater basis to find clear error here than the majority did there.

Perry also thinks that *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011), requires reversal here.  There, the police pursued the defendant for two blocks, "instructed" him to stop and walk towards the police, and frisked him.  *Id.* at 564–65.  Then, with Beauchamp "visibly shaking, wide-eyed, and scared"—and indeed so nervous that his pants were falling down—an officer asked for and obtained his consent to search.  *Id.* at 564 (quotation marks omitted).  On that constellation of facts we held that Beauchamp's consent was involuntary.  Perry says the same conclusion follows here.  We disagree:  nobody had pursued Perry from one block to another before the police sought her consent to search; and—as a veteran of 57 arrests—Perry was nowhere near the nervous wreck that Beauchamp purportedly was during his encounter with the police.  Indeed, Perry had enough firmness of spirit to threaten to kill everyone in the house as the police led her away.  The cases are distinguishable.

The district court did not clearly err in finding that Perry's consent was voluntary.

## B.

Under 18 U.S.C. § 924(e)(1), a defendant who is convicted of being a felon-in-possession in violation of § 922(g), and who also has three prior convictions for a

"violent felony" or a "serious drug offense," is subject to a mandatory-minimum sentence of 15 years. Here, the district court held that Perry had three such prior convictions. But she argues that one of them—a 2001 conviction for aggravated assault under Ohio Revised Code § 2903.12—does not qualify as a violent felony under § 924(e). That subsection defines "violent felony" as follows:

> any crime, punishable by imprisonment for a term exceeding one year . . . that—
>
> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

*Id.* § 924(e)(2)(B).

To determine whether a crime fits within this definition, we look "only to the fact of conviction and the statutory definition of the prior offense." *Shepard v. United States*, 544 U.S. 13, 17 (2005) (quotation marks omitted).

Ohio's aggravated-assault statute provides that "[n]o person . . . shall knowingly . . . cause serious physical harm to another" or "cause or attempt to cause physical harm . . . by means of a deadly weapon." Ohio Rev. Code § 2903.12(A)(1)–(2). By its plain terms, therefore, this statute proscribes conduct that "presents a serious potential risk of physical injury to another." Moreover, our court has already held, in an exhaustively reasoned opinion, that aggravated assault as defined by Ohio Revised Code § 2903.12 is a "crime of violence" under U.S.S.G. § 4B1.2(a). *See United States v. Rodriguez*, 664 F.3d 1032, 1036–39 (6th Cir. 2011). And we have also held that "[w]hether a conviction is a 'violent felony' under [§ 924(e)] is analyzed the same way as whether a conviction is a 'crime of violence' under" U.S.S.G. § 4B1.2. *United States v. McMurray*, 653 F.3d 367, 371 n.1 (6th Cir. 2011). It is true that in *Rodriguez* we relied on the fact that "aggravated assault is one of the enumerated crimes of violence listed" in the Application Notes for § 4B1.2 of the Sentencing Guidelines; and those Notes do not apply here. But other reasoning in *Rodriguez*—that the aggravated-assault

statute at issue here, "§ 2903.12, requires knowing and intentional conduct," and that "§ 2903.12 does require violence, in light of the statute's provision that the offender cause serious physical harm or physical harm by means of a deadly weapon," 664 F.3d at 1037, 1039 (quotation marks omitted)—does apply here. We adopt that reasoning and hold that aggravated assault under § 2903.12 is a violent felony as defined under § 924(e)(2)(B).

Perry does make one argument different in kind from those addressed in *Rodriguez*: that aggravated assault is not a violent felony because it is "an inferior-degree offense of felonious assault," which means that aggravated assault has the same elements as felonious assault as well as the "mitigating element of serious provocation." *State v. Smith*, 858 N.E.2d 1222, 1235 (Ohio Ct. App. 2006). And she contends that the inferior status of aggravated assault reflects a legislative judgment that aggravated assault poses less risk of physical injury than felonious assault does. We see no basis for that assumption. "To mitigate felonious assault to aggravated assault, the defendant must affirmatively prove by a preponderance of the evidence either sudden passion or sudden fit of rage brought on by the victim's serious provocation reasonably sufficient to incite the defendant into using deadly force." *Rodriguez*, 664 F.3d at 1039 (emphasis omitted). What the inferior status of aggravated assault reflects, therefore, is a marginal reduction in the defendant's culpability—not a reduced risk of injury.

Perry also argues that § 2903.12's "otherwise clause"—which classifies as aggravated felonies crimes that "otherwise involve[] conduct that presents a serious potential risk of physical injury"—is unconstitutionally vague. *See James v. United States*, 550 U.S. 192, 230 (2007) (Scalia, J., dissenting). But a majority of the Supreme Court has rejected that argument. *See id.* at 210 n.6.

## C.

Finally, Perry challenges the government's decision not to move for a three-point reduction in her guidelines offense-level for acceptance of responsibility. *See generally United States v. Lapsins*, 570 F.3d 758, 769–70 (6th Cir. 2009). That argument is moot,

given that the district court sentenced Perry to the minimum sentence permitted under the Armed Career Criminal Act.

The district court's judgment is affirmed.