RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-3929

DARRYL LEE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:14-cr-00104—Sara E. Lioi, District Judge.

Argued: June 10, 2015

Decided and Filed: July 15, 2015

Before: COLE, Chief Judge; GILMAN and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Wendi L. Overmyer, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Akron, Ohio, for Appellant. Carmen Evette Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Wendi L. Overmyer, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Akron, Ohio, Melissa M. Salinas, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant. Carmen Evette Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Darryl Lee was a parolee living in Ohio when his parole officer received a tip about "possible weapons going in and out of [Lee's] apartment."

1

The next day, officers searched the apartment without a warrant and discovered a firearm. Upon being charged with being a felon in possession of a firearm, Lee moved to suppress the evidence from the search. He argued that the search violated his Fourth Amendment rights because the officers did not have reasonable suspicion for the search and because he never consented to it. After the district court denied Lee's motion, he entered a conditional guilty plea and was sentenced to 53 months of imprisonment. Lee now appeals the denial of his suppression motion. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.      Factual background

The facts of this case are basically undisputed. In April 2013, Lee was released from a Pennsylvania state correctional institution where he had been imprisoned for aggravated assault with a firearm specification and for a separate weapons offense. He was sent to a therapeutic facility for help reintegrating into society before being placed on parole in Pennsylvania in August of that same year.

Lee's parole supervision was transferred to Ohio in September 2013 so that he could live with his girlfriend, Joshulen Harrison. Ohio Adult Parole Authority Officer (APAO) James Campana, who was assigned as Lee's parole officer, met with Lee later that month to go over the conditions of supervision. The conditions stipulated that Lee would obey all laws, including those related to illegal drug use, and that he would not possess any firearms or ammunition. They further provided that Lee would be subject to warrantless searches, pursuant to § 2967.131 of the Ohio Revised Code, which allows officers to "search, with or without a warrant," a parolee's person, residence, vehicle, or other property if they have "reasonable grounds to believe" that the parolee is violating the law or otherwise not complying with the conditions of parole. Ohio Rev. Code Ann. § 2967.131(C). Lee signed a copy of the conditions, indicating that he had read and understood them.

On December 21, 2013, Lee was pulled over by the Campbell, Ohio Police Department and arrested for felony possession of heroin and cocaine. Lee promptly reported the arrest to APAO Campana and met with him soon thereafter. Campana issued Lee a "unit sanction,"

directing him to comply with all court orders, appear for all scheduled court dates, and report to Campana as instructed. On Campana's advice, Lee also sought help from a drug-and-alcohol treatment program.

As Lee's parole officer, Campana conducted periodic, unannounced home visits to ensure that Lee was complying with the conditions of his parole. Campana had last visited Lee on January 28, 2014, just two days before the search at issue in the present case. His visit on January 28 raised no concerns for Campana about Lee's compliance with the conditions of parole.

The next day, however, Campana received a tip about Lee from fellow parole officer Robert O'Malley. Officer O'Malley reported that he had received a call from an off-duty Youngstown police officer who was providing security for the apartment complex where Lee resided and with whom O'Malley had "a good relationship." This unnamed officer informed O'Malley that the apartment-complex management had received reports from certain residents that there were "possible weapons going in and out of [Lee's] apartment." Neither the identities of the residents in question nor the timing of their reports is set forth in the record. Upon receiving the tip, Campana reported the same to his unit supervisor and suggested taking officers over to Lee's apartment to investigate. Campana did not attempt to corroborate the tip beforehand.

The following morning, Campana, accompanied by another parole officer and two Youngstown police officers, went to Lee's apartment complex. They knocked on Lee's door for approximately five minutes to no avail. Campana then tried calling Lee, but got no response. He next called Harrison, Lee's girlfriend and coresident, who said that Lee was home but "in the back sleeping." Harrison informed Campana that she was on her way back to the apartment and, when she arrived, she let the officers in.

Once inside, Campana and the other parole officer walked into the back bedroom where Lee was sleeping and woke him up. The officers then walked Lee back to the living room, where they handcuffed him and patted him down for safety purposes. Campana asked Lee: "Is there anything in this apartment that you should not have?" Lee responded: "No. Go ahead and look."

At that point, the two parole officers proceeded to search Lee's apartment while the Youngstown officers stayed with Lee in the living room.  The parole officers' search uncovered approximately $8,880 in cash, hypodermic needles and plastic bags, and a 9 millimeter handgun. Campana then arrested Lee.

**B.      Procedural background**

A federal grand jury indicted Lee in March 2014 for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Two months later, Lee moved to suppress the evidence seized during the officers' January 30, 2014 search of his apartment, arguing that the search violated his Fourth Amendment rights.   The district court summarized Campana's testimony at the suppression hearing in June 2014 as follows:

> At the suppression hearing, APAO Campana testified that he relied upon the tip that defendant had weapons in his apartment, defendant's recent drug arrest, and his history of weapons-related offenses in deciding to proceed to defendant's apartment on January 30, 2014.  He explained that he did not decide to search in December 2013, when he first learned about the drug arrest, because defendant had cooperated by reporting the arrest.  He explained that he became concerned when he received the tip in January 2014, however, because the tip involved the potential unlawful possession of weapons and defendant had a history of weapons violations.

Campana further testified that even if Harrison had not let the officers into the apartment that day, they would have nevertheless entered the apartment to conduct a search.

The district court denied Lee's suppression motion on two grounds:  (1) Harrison had consented to the officers' entry and Lee had consented to the search when he told Campana to "Go ahead and look," and (2) the officers had reasonable suspicion to conduct the warrantless search.  According to the court, reasonable suspicion was established by the totality of the circumstances—namely, the January 29, 2014 tip, Lee's December 21, 2013 arrest, and Lee's history of weapons-related convictions.  The court also found the tip to have "certain indicia of reliability" because it was conveyed by a Youngstown police officer who knew Officer O'Malley and who "found the tip sufficiently credible and reliable to prompt [the Youngstown police officer] to make further inquiries."

Shortly thereafter, Lee entered a conditional guilty plea that expressly reserved his right to appeal the district court's order denying his suppression motion. Three months later, the court sentenced Lee to 53 months of imprisonment, to be followed by three years of supervised release. Lee has timely appealed the denial of his suppression motion.

## II. ANALYSIS

The district court articulated two alternative grounds in holding that the January 30, 2014 search did not violate Lee's Fourth Amendment rights. First, the court found that Harrison consented to the officers' entry and that Lee consented to the subsequent search. Second, the court found that, even without consent, the officers had reasonable suspicion to search Lee's apartment. We have grave doubts concerning the district court's conclusion on reasonable suspicion, but because we agree with its conclusion on consent, we uphold the district court's denial of Lee's motion to suppress.

### A.     Standard of review

When reviewing the denial of a motion to suppress, we will set aside the district court's factual findings only if they are clearly erroneous, but will review de novo the court's conclusions of law. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012). Because Lee's motion was denied, we view the evidence in the light most favorable to the government. *See United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009).

Whether the officers had reasonable suspicion to search Lee's apartment is a mixed question of law and fact that we review de novo. *See United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). As for the question of consent, this court has inconsistently announced both a de novo and a clearly erroneous standard of review. *Compare United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008) (reviewing "the determination of the ultimate question of whether there was consent *de novo*," but giving "due weight" to the district court's factual inferences and credibility determinations), *with United States v. Canales*, 572 F.2d 1182, 1188 (6th Cir. 1978) (holding that whether consent is voluntary is a question of fact and that a finding of voluntary consent will be reversed only if clearly erroneous) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222-23 (1973)), *and United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (same).

*Schneckloth*, cited by this court in *Canales* and *Erwin*, clearly holds that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 227. This court recently discussed its prior use of the two different standards and chose to follow *Schneckloth*. *United States v. Holland*, 522 F. App'x 265, 271 (6th Cir. 2013) (calling *Schneckloth* the "leading case on the issue" and noting the lack of "a convincing argument to the contrary"). *Canales* and *Erwin*, moreover, are the controlling Sixth Circuit opinions on this issue because a later panel of the court cannot overrule the published decision of a prior panel— particularly an en banc panel—in the absence of en banc review or an intervening opinion on point by the Supreme Court. *See Salmi v. Sec'y of Health & Human Svcs.*, 774 F.2d 685, 689 (6th Cir. 1985). We will therefore review the question of consent under the "clear error" standard.

**B.     The district court did not err in denying Lee's suppression motion**

A warrantless search of a parolee's dwelling where officers lacked reasonable suspicion is nevertheless constitutional if it was conducted with the consent of a resident. *See Schneckloth*, 412 U.S. at 219 ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). "When seeking to justify a search based on consent, the government has the burden of showing by a preponderance of the evidence that the consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority." *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir. 1994) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The district court determined that both the officers' entry and their subsequent search were consented to—the entry by Lee's girlfriend and the search by Lee himself.

*1.     The officers' entry*

Lee admits that Harrison physically allowed the officers to enter the apartment, but takes issue with the officers' failure to "disclose their intentions or purpose" of the search. He claims that the officers' omission of their purpose—to search the premises—is a misrepresentation that negates Harrison's consent. But any alleged misrepresentation by the officers is distinguishable from the outright deception that this court has found to undermine consent in prior cases. *See,*

*e.g.*, *United States v. Hardin*, 539 F.3d 404, 424-25 (6th Cir. 2008) (holding that a government agent's "ruse that he was investigating a water leak invalidated any possible consent" where "the effect of the ruse is to convince the resident that he or she has no choice but to invite the undercover officer in").

The officers' entry in the present case was clearly permissible in light of *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004), where the defendant allowed officers who had first identified themselves as "housekeeping" into his hotel room. Despite the initial misrepresentation, this court held that the district court did not clearly err in finding that the defendant had validly consented to the officers' entry because "[t]he investigating officers were instantly recognizable as policemen when [the defendant] opened the door. They properly asked permission to enter, and [the defendant] stepped back, letting them in." *Id.* at 588.

No initial misrepresentation was made here, and Lee does not dispute that the officers were plainly identifiable or that Harrison, as Lee's coresident, was authorized to grant the officers entry. Nor does the fact that the officers would have entered even without consent invalidate the consent that Harrison actually gave. *See id.* at 589 ("[The defendant] makes much of the fact that [the detective] apparently intended in any event to enter the room to seize the blunt. What [the detective] might have done had consent not been given is, of course, irrelevant."). We therefore conclude that the district court did not err in finding that Harrison validly consented to the officers' entry.

### 2. *The search*

Lee next argues that his consent to the search itself was invalid. The crux of Lee's argument is that his consent was tainted by the allegedly illegal entry and by his being handcuffed and frisked before the officers sought his consent. Because we have found no error in the district court's conclusion that the officers' entry was legal, Lee's argument on this issue turns on whether being handcuffed and frisked made his consent to the search involuntary.

As the district court correctly noted, just because a defendant is handcuffed when he or she gives consent does not make such consent invalid. *See United States v. Perry*, 703 F.3d 906, 909 (6th Cir. 2013) (holding that the defendant's consent was voluntary despite the fact that "she

was handcuffed when she gave it, that the police were armed, that the police never told her that she could decline to consent, and that she was drunk at the time"). The *Perry* court held that the district court did not clearly err in finding that the defendant's consent was voluntary because she had been arrested (and handcuffed) before and her encounter with the officers "was brief, without any repeated questioning or physical abuse." *Id.*

Lee's verbal consent to the search—responding to Campana's question about whether there was anything Lee should not have in the apartment with: "No. Go ahead and look."—is very similar to the defendant's valid consent in *United States v. Canipe*, 569 F.3d 597 (6th Cir. 2009). In *Canipe*, an investigator conducting a traffic stop (the admitted purpose of which was to find out if the defendant had a firearm) asked the defendant "whether he had 'anything' in his vehicle that might be unlawful or about which [the investigator] needed to know," to which the defendant responded: "No, he didn't think so." *Id.* at 600. The investigator then asked "whether 'it would be all right if I looked in' the vehicle or '[y]ou care if I look?'" *Id.* In language equivalent to that used by Lee, the defendant in *Canipe* said that a search "wouldn't be a problem." *See id.*

This court in *Canipe* held that the district court did not clearly err in its conclusion that the defendant's consent "was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. The duration of the detention and questioning [was] reasonable. There was no evidence of coercion. [The defendant] never asked to leave." *Id.* at 604. Based on both *Perry* and *Canipe*, we find no error, much less clear error, in the district court's conclusion that Lee validly consented to the officers' search.

**C.     The officers in all likelihood lacked reasonable suspicion to perform a warrantless search of Lee's residence**

Because we have found no error in the district court's conclusion that Harrison consented to the officers' entry and that Lee consented to the search, we need not decide whether the officers also had reasonable suspicion for the search. But we have grave doubt that they did.

As a parolee in Ohio, Lee was subject to warrantless searches if the officers had "reasonable grounds to believe" that he was violating the law or the conditions of his parole. *See* Ohio Rev. Code Ann. § 2967.131(C). This court has already found the "reasonable grounds"

standard of this Ohio statute to be constitutional. *United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003) ("O.R.C. § 2967.131(C) passes constitutional muster . . . ."). The Supreme Court has also held that, under the totality-of-the-circumstances approach, officers generally need only "reasonable suspicion" to search a probationer's home. *United States v. Knights*, 534 U.S. 112, 121 (2001).

"Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The district court in the present case relied on (1) the anonymous tip about possible weapons at Lee's apartment, (2) Lee's recent drug arrest, and (3) Lee's history of weapons-related offenses to find that reasonable suspicion existed.

"[U]nder appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion . . . ." *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014) (internal quotation marks omitted). Such indicia can include an officer's independent corroboration of significant parts of the tip or the tipster demonstrating a "special familiarity" with the subject's affairs by accurately predicting the subject's future behavior. *Alabama v. White*, 496 U.S. 325, 331-32 (1990) (holding that an anonymous tip, independently corroborated by the police, that the defendant would be leaving a particular apartment at a particular time in a particular vehicle to go to a particular motel and that she would be in possession of cocaine exhibited sufficient indicia of reliability). Related indicia include the timing of the tip and the degree to which the tipster's credibility is verifiable. *See Navarette*, 134 S. Ct. at 1688-89 (holding that a 911 caller's tip that a vehicle had run her off the road provided reasonable suspicion for the officers to stop a vehicle matching the caller's description just 18 minutes later).

But none of these indicia of reliability is present here. The tip about possible weapons at Lee's apartment first originated from unknown residents of Lee's apartment complex on an unknown date or dates. Management of the apartment complex then passed the information along to an off-duty Youngstown police officer, who in turn raised the issue with APAO

O'Malley, who finally conveyed the information to APAO Campana. This vague, uncorroborated tip that passed through multiple layers of hearsay was far weaker than the contemporaneous, eyewitness report made through a traceable call system in *Navarette* or the specific and independently corroborated tip in *White*.

Nor does the fact that the tip "was conveyed by a trained Youngstown police officer, with whom APAO O'Malley had [a] prior relationship," and who "found the tip sufficiently credible and reliable to prompt him to make further inquiries with the Adult Parole Authority," lend it credibility. The district court's conclusion simply assumes the reliability of the underlying tip. But just because a tip was passed through a police officer does not automatically make it reliable. *See Payne*, 181 F.3d at 789 (finding that a tip that had passed from a detective to a parole officer to another parole officer was unreliable and stale).

Finally, although this court has recognized that "[e]ven a less-than-reliable tip may add something to the totality of the circumstances for determining reasonable suspicion," the remainder of the circumstances cannot relate solely to the parolee's criminal history, as they did here. *See id.* at 790-91 ("[A] person's criminal record alone does not justify a search of his or her home, and the tip in this case adds so little that it does not reach the level of reasonable suspicion."). Three woefully insufficient factors do not equal reasonable suspicion, even under a totality-of-the-circumstances approach. *See id.* at 789 (holding that the officers did not have reasonable suspicion to search the parolee's property even when the parolee (1) had committed drug crimes in the past; (2) according to a tip, had been in possession of a large amount of drugs; (3) had absconded from supervision; and (4) hid from officers when they came to arrest him).

All of the above leaves us with grave doubt concerning whether Officer Campana had reasonable suspicion to search Lee's residence. But we nevertheless conclude that, because Lee consented to the officers' search, the district court did not err in denying Lee's suppression motion.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.