RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLIAM DALE WOODEN,

*Defendant-Appellant*.

No. 19-5189

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:15-cr-00012-1—Thomas A. Varlan, District Judge.

Decided and Filed: December 19, 2019

Before: GILMAN, KETHLEDGE, and READLER, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Michael B. Menefee, MENEFEE & BROWN, P.C., Knoxville, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

CHAD A. READLER, Circuit Judge. While at home on a cold November morning, William Wooden heard a knock at the door. Upon opening it, Wooden was greeted by a man asking to speak with Wooden's wife. Wooden went to get her. And he allowed the man to enter the home, to stay warm while waiting for Wooden to return.

But Wooden's humane gesture soon became his undoing. As from there, things began to unravel. Wooden picked up a firearm. The man at the door turned out to be a plainclothes police officer. And the officer knew that Wooden was a convicted felon who could not lawfully possess a firearm. Wooden was thus taken into custody.

Wooden was later convicted and sentenced on a felon-in-possession charge. On appeal, Wooden asserts two challenges to that result. With respect to his conviction, Wooden contends that the officer's presence in his home violated the Fourth Amendment, meaning that much of the evidence used against him should have been suppressed. And as to his sentence, Wooden challenges the fifteen-year term of imprisonment imposed by application of the Armed Career Criminal Act. Finding no error in the district court's Fourth Amendment or sentencing analyses, we **AFFIRM** the decision below.

## BACKGROUND

Along with two uniformed officers, Conway Mason, an Investigator for the Monroe County (Tennessee) Sheriff's Department, set out early one chilly November morning to track down Ben Harrelson, a fugitive wanted for theft. The officers had previously seen Harrelson's vehicle parked outside the home of William Wooden and Janet Harris. Believing Harrelson might be hiding inside, the officers approached the home. Mason, who was not in uniform, went to the front door, and the two uniformed officers dispersed around the home.

Mason knocked on the door. When Wooden answered, Mason asked to speak with Harris. Mason also asked if he could step inside, to stay warm. According to Mason, Wooden responded "Yes. That's okay"—which Mason took to mean he could come inside.

Mason, along with a second officer, entered the home. As Wooden walked down the hallway, the officers saw him pick up a rifle. When the officers told him to put the weapon down, Wooden did as instructed. Mason knew Wooden was a felon, meaning he could not possess a firearm. So the officers took the rifle and handcuffed and searched Wooden. During the search, the officers discovered a loaded revolver holstered on Wooden.

Harris gave the officers permission to search the home.  The officers did not find Harrelson.  But they did find a third weapon, a .22 caliber rifle.  After waiving his *Miranda* rights, Wooden admitted that he possessed all three firearms as well as ammunition.

Federal prosecutors subsequently filed an indictment charging Wooden with being a Felon in Possession of Firearms and Ammunition, in violation of 18 U.S.C. § 922(g)(1). Wooden in turn moved to suppress the evidence discovered during the search of his home.  In his motion, Wooden argued that the officers violated his Fourth Amendment rights by entering his home without a warrant or his consent.  The district court, however, denied Wooden's motion on the basis that Wooden consented to the officers' entry.  At his subsequent jury trial, Wooden was convicted as charged.

The probation office prepared a presentence report in which Wooden was classified as an armed career criminal under the Armed Career Criminal Act (or ACCA), given that he had three or more prior violent felony convictions.  The basis for the classification was Wooden's prior Georgia convictions:  a 1989 aggravated assault, ten 1997 burglaries, and a 2005 burglary. Wooden objected to the classification.  He argued that neither the aggravated-assault nor burglary offenses qualify as violent felonies under the ACCA.  He likewise contended that the ten 1997 burglaries arose out of a single occasion and thus qualify as a single ACCA predicate, rather than ten.

At the sentencing hearing, the district court rejected Wooden's objections.  The court held that the Georgia burglary qualified as a violent felony under the ACCA.  As to Wooden's 1997 burglary convictions specifically, the court held that each conviction qualified as a separate ACCA predicate offense.  Wooden filed a timely appeal, and we now take up these same issues for review.

## ANALYSIS

### I.    The District Court Properly Denied Wooden's Motion To Suppress.

Wooden first challenges the district court's denial of his motion to suppress evidence obtained after the officers entered his home.  Wooden cites two purported errors.  One, that he

did not consent to the officer's entry into his home. And two, even if he did consent, that consent was not valid because the officer used deception to attain his consent.

Wooden's claims invoke the protections afforded by the Fourth Amendment to the United States Constitution. That familiar provision preserves "[t]he right of the people to be secure in their persons, houses, papers, and effects[.]" U.S. CONST. amend. IV. In recognition of that right, an officer must have at least "reasonable suspicion" of criminal activity before infringing on a person's privacy and subjecting that person to a search or seizure. *See Ornelas v. United States*, 517 U.S. 690, 693 (1996) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). In that way, "the Fourth Amendment protects '[t]he security of one's privacy against arbitrary intrusion by the police . . . .'" *David Levell W. v. California*, 449 U.S. 1043, 1048 (1980) (quoting *Wolf v. Colorado*, 338 U.S. 25, 27 (1949) (alteration and ellipsis in original)).

The Fourth Amendment, of course, protects people, not places. But in assessing what protection one is owed, we must naturally consider the place of the search. And for Fourth Amendment purposes, the search here occurred on sacred ground, as "the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). This means government agents, oftentimes law enforcement officers, cannot enter a person's home unless the officer has a warrant supported by probable cause, or there exists a valid exception to the warrant requirement. *See Kentucky v. King*, 563 U.S. 452, 459 (2011). If officers enter a home without a warrant and without any other valid justification, courts will suppress the evidence obtained during that search, rendering the evidence inadmissible at trial. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

When analyzing a district court's decision to deny a motion to suppress evidence allegedly obtained in violation of the Fourth Amendment, we review the district court's legal conclusions de novo. *United States v. Carpenter*, 926 F.3d 313, 317 (6th Cir. 2019) (quoting *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015)). With respect to the district court's factual findings, however, we review them only for clear error. *See United States v. Winters*, 782 F.3d 289, 294–95 (6th Cir. 2015). A factual finding is clearly erroneous when we are left with "the definite and firm conviction" that the district court has made a mistake. *United States v. Cooper*, 893 F.3d 840, 843 (6th Cir. 2018) (citation omitted). In examining the underlying

evidentiary record, we defer to the district court's assessment of each witness's credibility, and we review the evidence in the light most likely to support the district court's decision. *United States v. Lawrence*, 735 F.3d 385, 436 (6th Cir. 2013) (citations omitted).

**A.      The District Court's Determination That Wooden Consented
         To Mason Entering His Home Was Not Clearly Erroneous.**

1.  As a state law enforcement officer, Mason was bound by the constraints of the Fourth Amendment in investigating criminal activity on the part of Wooden.  One constraint was the warrant requirement, and all parties agree that Mason did not have a warrant authorizing him to search Wooden's home.  To validate Mason's search under the Fourth Amendment, then, there must be an applicable warrant exception justifying Mason's entry into the home.

Relevant today is the warrant exception applicable in instances where an occupant of a home consents to an officer's entry. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006).  Where an occupant's consent is freely given, and not the result of undue coercion, the resulting search satisfies Fourth Amendment muster. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). Wooden contends that he did not consent to Mason's entry.  But in disputing that factual finding, Wooden faces an uphill climb at this stage, in view of our deferential standard of review.  That is, Wooden's arguments must lead us to "the definite and firm conviction" that the district court erred in assessing the record. *Cooper*, 893 F.3d at 843.  Wooden has not met his burden.

2.  We start with two points of agreement.  All agree that if Wooden gave valid consent to Mason's entry, the district court properly denied Wooden's motion to suppress.  And all agree that, when Wooden answered Mason's knock on the door, Mason asked if he could speak with Harris, and asked if he could wait inside in the meantime.

From there, the parties diverge.  Mason, while not certain of the exact words Wooden used in response, testified that Wooden told him he could wait inside.  Wooden, on the other hand, testified unequivocally that he did not consent to Mason's entry.  Seizing on Mason's partial equivocation, Wooden says that he was the more credible witness, noting that only he could remember exactly what was said between the two.

Assessing that collection of testimony, the district court held that Wooden did in fact consent to Mason's entry.  Yes, as Wooden notes, the testimony was at times conflicting.  But the responsibility for weighing conflicting testimony lies primarily with the district court, and its conclusions are given due respect.  The district court evidently credited Mason's testimony, a determination to which we customarily defer, given the district court's front-row view of the evidentiary proceedings.  *See Lawrence*, 735 F.3d at 436, 438.   Seeing no "definite and firm" basis for discrediting the district court's assessment that Wooden consented to Mason entering his home, there was no clear error below warranting reversal.  *See Cooper*, 893 F.3d at 843.

### B.     The Fruits Of The Search Were Not Obtained As A Result Of Police "Deception."

Disagreeing that he consented to the search of his home, Wooden alternatively argues that any purported consent was obtained through deception, making it invalid.  But as forcefully as he makes that argument today, Wooden failed to do so in the district court.  That failure begs the question whether there is any basis for this Court to consider the argument.

Sometimes, the failure to raise an issue in the district court is deemed a "waiver," meaning that we will not consider the claim at all.  *See, e.g.*, *United States v. Street*, 614 F.3d 228, 235 (6th Cir. 2010).  Other times, we will deem an unraised argument as merely "forfeited," meaning that we will consider the claim, but only against the backdrop of the demanding plain-error standard.  *See, e.g.*, *United States v. Mabee*, 765 F.3d 666, 671 (6th Cir. 2014).  When and how those doctrines apply is not always easy to assess, a struggle our cases oftentimes reflect.  Our Fourth Amendment jurisprudence is no exception.  Indeed, our prior cases assessing the waiver/forfeiture distinction in the context of motions to suppress reveal some apparent tension.  A case in point is *United States v. Deitz*.  In *Deitz*, we noted that a defendant's failure to file a motion to suppress is treated as a waiver of suppression issues.  577 F.3d 672, 687 (6th Cir. 2009).  So far, so good.  But we went on in *Deitz* to distinguish the scenario of failing to file a motion to suppress with the scenario of filing a motion to suppress that nonetheless failed to raise an argument later asserted on appeal.  And that latter setting, we noted, we had previously treated as a forfeiture, rather than a waiver.  *Id.*

Recognizing the potential conflict between applying waiver in one suppression setting and forfeiture in another, *Deitz* assumed without deciding that forfeiture applies when some (but not all) suppression arguments are raised in an unsuccessful motion to suppress. Accordingly, *Deitz* applied a plain-error standard to the previously unraised argument. *Id.* at 691. Today, we follow *Deitz*'s lead. That is, assuming for purposes of argument that Wooden's unraised suppression claim is properly before us, Wooden nonetheless cannot demonstrate plain error.

More settled is the standard we apply in evaluating the proceedings below for plain error. Plain error means an "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation marks omitted). No such error occurred here.

Much of Wooden's challenge turns on the fact that Mason was neither in uniform nor identified himself as a police officer. Both are true. But generally speaking, neither amounts to improper deception in the Fourth Amendment context. *United States v. Baldwin*, 621 F.2d 251, 252–53 (6th Cir. 1980) (citing *Lewis v. United States*, 385 U.S. 206, 211 (1966)). Nor did Mason take any affirmative steps to attempt to deceive Wooden regarding his identity. Mason was silent as to his official position; he did not hold himself out to be anything he was not. He merely asked to speak to Harris and then asked if he could come inside, to get out of the cold.

Wooden has little to say in response. He seems to suggest that we should revisit *Baldwin* in light of the Supreme Court's decisions in *Florida v. Jardines*, 569 U.S. 1 (2013), and *United States v. Jones*, 565 U.S. 400 (2012), which, together, described the Fourth Amendment's roots in the common law of trespass. Even accepting that latter understanding of the Fourth Amendment, it will nevertheless remain true that an officer's undercover status does not amount to deception under ordinary trespass principles. Wooden finds deception in the fact that he could not see the two uniformed officers on or near his property. But that is neither here nor there. The officers were not required to announce themselves. And their presence had no bearing on whether Mason did something to deceive Wooden. All told, the district court did not err, plainly or otherwise, in failing to equate Mason's conduct with improper deception. For these reasons, Wooden's consent-by-deception claim fails.

**II.    Wooden's Ten Burglary Convictions Were Each ACCA-Qualifying Offenses.**

1.  In addition to the denial of his motion to suppress, Wooden also challenges the district court's decision to sentence Wooden under the ACCA.  At issue here is the ACCA's instruction that a defendant is subject to a fifteen-year minimum sentence if the defendant has previously been convicted of at least three ACCA-qualifying offenses.  18 U.S.C. § 924(e)(1).

That brings us to Wooden's numerous prior convictions under Georgia law:  one for aggravated assault and eleven for burglary, ten of those coming in 1997.  In view of Wooden's criminal history portfolio, the probation office recommended that Wooden be classified as an armed career criminal.  Wooden objected to that recommendation on two grounds: one, that neither Georgia's aggravated-assault nor burglary offense is an ACCA-qualifying offense, and two, even if Georgia's burglary offense so qualifies, the ten 1997 burglaries arose out of a single occurrence, meaning they qualified as a single ACCA predicate.  But the district court saw things differently.  It determined that the Georgia burglaries were ACCA-qualifying offenses and, further, that Wooden's ten 1997 convictions each counted as a qualifying offense.

2.  As set forth in 18 U.S.C. § 924(e)(1), to qualify as separate ACCA predicate offenses, multiple offenses must be "committed on occasions different from one another."  So what does it mean for offenses to occur on different occasions?  Our ordinary interpretive starting line is the text of the statute at issue.  But neither § 924 nor its statutory counterparts offer any further definition of the phrase.

In the absence of additional statutory direction, our prior decisions have helped fill this interpretive gap, albeit with some lack of precision.  Start with *United States v. Hill.*  There, we recognized "at least three indicia that offenses are separate from each other":

- Is it possible to discern the point at which the first offense is completed and the subsequent point at which the second offense begins?

- Would it have been possible for the offender to cease his criminal conduct after the first offense and withdraw without committing the second offense?

- Were the offenses committed in different residences or business locations?

*United States v. Hill*, 440 F.3d 292, 297–98 (6th Cir. 2006) (collecting cases); *see also United States v. Paige*, 634 F.3d 871, 873 (6th Cir. 2011). But *Hill* in many respects serves only as a starting point. After all, we have characterized it as articulating "informative standards, not hidebound rules." *United States v. Jenkins*, 770 F.3d 507, 510 (6th Cir. 2014). Said differently, *Hill*, far from establishing a bright-line, three-factor analysis, instead simply "sharpen[ed] the [different occasions] inquiry by focusing the court on the kinds of questions that have come up in prior ACCA cases." *Id.* And so while it is true that "[o]ffenses are separate if they meet *any* of these three tests" articulated in *Hill*, *United States v. Jones*, 673 F.3d 497, 503 (6th Cir. 2012) (emphasis in original) (citing *Paige*, 634 F.3d at 873), the *Hill* inquiries seemingly are just some of the questions to which an affirmative answer would reveal that multiple offenses should be deemed separate. *See Jenkins*, 770 F.3d at 510 (describing the "*any* of these three tests" statement from *Jones* as dictum).

3. To the extent there remains any precedential uncertainty in this sentencing setting, it makes no difference here, for Wooden's argument comes up short, no matter the metric. Back to Wooden's ten convictions for violating Georgia's burglary statute, Ga. Code Ann. § 16-7-1 (a) (1997). One violates that Georgia law when she "enters or remains within" a "building" to commit an offense. *Id.* Recognizing that *Hill* may be more a floor than a ceiling with respect to articulating the characteristics of a separate offense, we can easily resolve today's case by relying on *Hill*'s guidance alone.

Against the backdrop of *Hill*, we must first consider whether it is possible to discern the point at which Wooden's first offense for entering or remaining in a building was completed and the subsequent point at which his second offense began. Wooden believes the record is too thin to make that assessment. But the indictment to which Wooden pleaded guilty provides all the record we need. *See United States v. King*, 853 F.3d 267, 272 (6th Cir. 2017) (citing *Shepard v. United States*, 544 U.S. 13, 20 (2005)) (holding that when a guilty plea leads to a conviction for violating a statute with alternative elements, courts look to certain documents in the record to determine whether that conviction qualifies as an ACCA predicate). Wooden was accused of, and pleaded guilty to, "entering" ten different mini warehouses. Whatever the contours of a "mini" warehouse, Wooden could not be in two (let alone ten) of them at once. Rather, Wooden

must have left one warehouse to "enter" another. It takes little imagination then to conclude that Wooden "entered" ten separate warehouses, and thus committed ten distinct acts of burglary, as measured by Georgia law.

This conclusion accords with *Hill*. There, we determined that two burglary offenses were separate offenses despite Hill arguing that there was "not a discernable lapse of time between them." *Hill*, 440 F.3d at 295. By way of background, Hill committed a burglary, left the location, and then illegally entered and stole from a separate location. That course of conduct, we concluded, counted for two burglaries, not one, as the first burglary was completed before the next one began. *Id.* For § 924(e)(1) purposes, then, those burglaries constituted two ACCA predicate offenses. *Id.* at 297–98.

For many of the same reasons, Wooden satisfies the second and third *Hill* guideposts as well. Start with the second—whether Wooden could have ceased his criminal conduct after the first offense and withdrawn without committing the second offense. We see no reason why it would have been impossible for Wooden to call it a night after the first burglary, without burglarizing nine more warehouses.

So too for the third *Hill* guidepost—whether Wooden's offenses were committed in different locations. They were. Each warehouse was its own location, with its own building number and storage space. And there were many different lawful occupants of those warehouses. Perhaps, as Wooden does, one could characterize this cluster of warehouses as being adjoined "at the same business location." *Hill* too spoke of different "residences or business locations," a phrase intended to assess whether each offense infringed upon a different bundle of property rights for ACCA purposes. In *Hill*, we concluded that the offenses were committed at different locations, as they involved different property rights. And using *Hill* as a yardstick, the same must be true for Wooden, who was convicted of burglarizing ten individual warehouses (rather than one storage business), and thus infringing upon ten distinct sets of property rights.

By any measure, then, Wooden satisfies the *Hill* standard.  That means his burglary offenses were separate offenses for purposes of the ACCA, and thus there was no error in his imposed sentence.

**III.          Wooden's Claim Based On *Rehaif v. United States* Is Forfeited.**

In his reply brief, Wooden claims for the first time that the government failed to prove that Wooden knew he was a convicted felon.  And citing *Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019), Wooden contends that proving he had knowledge of his status as a felon is an essential element of being deemed a felon in possession of a firearm under 18 U.S.C. § 922(g)(1).  Like the defendant in *Rehaif*, Wooden grounds his claim in the jury instructions outlining the elements of § 922(g).  Both in *Rehaif* and here, the respective jury instructions omitted any instruction to the jury that the government needed to prove the defendant's knowledge of his prohibited status. 139 S. Ct. at 2195.

Setting aside the distinct nature of the underlying issue in *Rehaif*, Wooden has an equally difficult procedural hurdle to clear.  That is, we have long held that a party forfeits any claim that is not set forth in the party's opening brief.  *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 257 (6th Cir. 2018).  Yes, the Supreme Court decided *Rehaif* after Wooden filed his opening brief.  But the Supreme Court granted the petition for certiorari and heard oral argument in *Rehaif* well before Wooden's filing.  In that way, the legal issue here—whether Wooden's jury instructions needed to explain that the government must prove Wooden's knowledge of his prohibited status—was at the forefront of the relevant legal landscape.  *See id.* (noting that when an argument is being presented by litigants in other jurisdictions, not presenting that argument is a forfeiture even when subsequent decisions make that argument more apparent).  And it would be self-refuting for Wooden to argue that he could not have presented his claim until after *Rehaif* was decided.  After all, the defendant in *Rehaif* did just that.  Accordingly, Wooden's *Rehaif* claim is forfeited.

**CONCLUSION**

For these reasons, we **AFFIRM** the judgment of the district court.