SUMMARY October 21, 2021 2021COA127 No. 19CA0913, In the Interest of C.C-S. — Juvenile Court — Delinquency; Constitutional Law — Fourth Amendment — Searches and Seizures — Exclusionary Rule; Department of Law — Safe2tell Act A division of the court of appeals concludes that under the reasonableness standard adopted by the supreme court in People in Interest of P.E.A., 754 P.2d 382, 387 (Colo. 1988), a search and seizure of a student by school officials based on an anonymous tip received through Colorado’s Safe2Tell hotline did not satisfy the Fourth Amendment. The division determines that the school officials improperly relied on information that was anonymous, stale, and uncorroborated, and did not provide reasonable suspicion that the juvenile had violated the law. The division also holds that the exclusionary rule applies to searches of students by school officials. Accordingly, applying the The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion. 
exclusionary rule under the circumstances presented here, the division reverses the trial court’s adjudication of delinquency and remands the case for a new trial. 
COLORADO COURT OF APPEALS 2021COA127 Court of Appeals No. 19CA0913 City and County of Denver Juvenile Court No. 18JD736 Honorable Donna J. Schmalberger, Judge The People of the State of Colorado, Plaintiff-Appellee, In the Interest of C.C-S., Juvenile-Appellant. JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS Division I Opinion by JUDGE TAUBMAN* Dailey and Johnson, JJ., concur Announced October 21, 2021 Philip J. Weiser, Attorney General, Grant R. Fevurly, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Matthew A. Hardy, Alternate Defense Counsel, Denver, Colorado, for Juvenile-
Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020. 
1 ¶ 1 Defendant C.C-S., a juvenile, appeals the trial court’s judgment adjudicating him delinquent based on findings that he possessed marijuana illegally as an underage person, see § 18-13-
122(3)(b), C.R.S. 2020, and illegally possessed marijuana with intent to distribute, see § 18-18-406(2)(b), C.R.S. 2020. C.C-S. contends that the trial court erred by denying his motion to suppress the marijuana and paraphernalia, the only evidence supporting the court’s adjudication, because they were discovered in the course of an unreasonable search and seizure of his backpack at school, conducted after an initial, illegal seizure of his person. ¶ 2 This case requires us to address for the first time the standard to be applied when school officials conduct a seizure or detention of a student. We are confronted with whether, under the reasonableness standard adopted by our supreme court in People in Interest of P.E.A., 754 P.2d 382, 387 (Colo. 1988), the Fourth Amendment is satisfied in the context of this case where a search of a student by school officials was based on anonymous information received through Colorado’s Safe2Tell hotline. Finally, we must address for the first time whether the exclusionary rule applies to 
2 searches of students by a school official. Because we conclude that the trial court erred by relying on a tip received through the state’s Safe2Tell program, we agree with C.C-S. that his search and detention were illegal. We also conclude that the exclusionary rule applies in the context of school searches, and therefore, because the evidence of the search should have been suppressed, we reverse the adjudication. I. Background ¶ 3 A school security officer employed by Denver Public Schools (DPS) received a report that C.C-S., a student at a DPS high school, had been seen in a Snapchat video shooting a firearm out of a car window. ¶ 4 The tip was reported through the statewide Safe2Tell program, see §§ 24-31-601 to -611, C.R.S. 2020, which allows students, parents, and staff members within a school district to submit anonymous tips about potential school safety concerns. Tips are then emailed to the DPS security team. ¶ 5 By the time the Snapchat video showing C.C-S. was reported to Safe2Tell on February 25, 2018, it was about one month old. At that point, no one was able to review the footage because videos 
3 posted on Snapchat automatically disappear from the platform after twenty-four hours, unless they are saved.1 Although unable to review the Snapchat video, the dean of C.C-S.’s school told the school security officer that C.C-S. had a history of “bringing things to school that he shouldn’t, such as drugs and things like that.” ¶ 6 At that point, the school security officer decided to search C.C-S., based on the Safe2Tell firearm tip, the dean’s comment, and the security officer’s policy of searching every student and their backpack when he received a Safe2Tell report that the student had either drugs or weapons. Once C.C-S. arrived at school, he was taken to an office for questioning by the school security officer, as well as a campus security officer, who was also employed by DPS but was stationed at C.C-S.’s school. With the door closed, the DPS 1 “Snapchat is a social media application that allows users to send or post still images or videos. . . . A user may post images or videos to their ‘story,’ which allows all those individuals with whom the user is ‘friends’ to view them in the user’s Snapchat page, but they remain available for viewing only for twenty-four hours.” Commonwealth v. Watkins, 156 N.E.3d 235, 237 (Mass. App. Ct. 2020). Also, a sender of a Snapchat video may save it to the sender’s local phone gallery, and the recipient may save it by taking a screenshot. Clinton T. Magill, Note, Discovering Snapchat: How Will Snapchat and Similar Self-Destructing Social Media Applications Affect Relevance and Spoliation Under the Federal Rules of Civil Procedure?, 9 Charleston L. Rev. 365, 373 (2015). 
4 officers told C.C-S. about the information they had received from the Safe2Tell tip and told him they were going to search his backpack. ¶ 7 C.C-S. refused to consent to a search and, after further discussion, attempted to leave the office. The DPS officers would not allow him to leave, instead reiterating that they were going to search his backpack. After the campus security officer asked C.C-S. whether he was refusing to allow the search because he had drugs in his backpack, C.C-S. confessed that he had drugs in his backpack and handed it over to the officers to be searched. ¶ 8 Although no weapons were found in C.C-S.’s backpack, the DPS officers found a plastic bag of marijuana, as well as marijuana paraphernalia: a scale, more plastic bags, and cigar wraps. Based on this evidence, the People charged C.C-S. in a delinquency petition with underage possession of marijuana and possession with intent to distribute marijuana. ¶ 9 C.C-S. moved to suppress the marijuana and the paraphernalia found in his backpack on grounds that they were discovered during an unconstitutional detention of his person and search and seizure of his backpack. The juvenile court denied the 
5 motion, ruling that the Safe2Tell firearm tip, plus the dean’s comment about C.C-S.’s history of bringing drugs to school, were sufficient justification for the search of his backpack. ¶ 10 Following a bench trial, C.C-S. was found guilty of both marijuana charges and was adjudicated delinquent. II. Standard of Review ¶ 11 In reviewing a trial court’s ruling on a motion to suppress evidence, we defer to the court’s findings of fact but evaluate its conclusions of law de novo. See People v. Hammas, 141 P.3d 966, 969 (Colo. App. 2006). III. Evidence Obtained in Unlawful Search and Seizure ¶ 12 C.C-S. contends that the information contained in the anonymous Safe2Tell tip was stale and that the dean’s comment about C.C-S.’s history of bringing drugs to school did not furnish sufficient grounds to search his backpack. C.C-S. acknowledges that he admitted to having drugs in his backpack while in the closed-door office and that he handed it to the officers to be searched. He asserts, though, that his admission does not justify the otherwise illegal search because, when it was made, C.C-S. was unreasonably detained. We agree with both contentions. 
6 A. Standard of Review and Applicable Law ¶ 13 The Fourth Amendment prohibits unreasonable searches and seizures. People v. Bailey, 2018 CO 84, ¶ 18, 427 P.3d 821, 826. This prohibition safeguards individuals’ privacy and security against arbitrary intrusion by government officials, People v. Coke, 2020 CO 28, ¶ 33, 461 P.3d 508, 515-16, and it extends to searches of students by public school officials, New Jersey v. T.L.O., 469 U.S. 325, 333 (1985). Ordinarily, a warrantless search “must be based upon ‘probable cause’ to believe that a violation of the law has occurred.” Id. at 340 (citations omitted). However, this standard is relaxed in the school setting to accommodate “the substantial need of teachers and administrators for freedom to maintain order in the schools.” Id. at 341; P.E.A., 754 P.2d at 387. We therefore evaluate the legality of school searches according to the less stringent reasonableness standard set forth by the Supreme Court in T.L.O. ¶ 14 When assessing the reasonableness of a school search or seizure, we look to traditional Fourth Amendment principles to evaluate, “on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other hand, the degree to which it is 
7 needed for the promotion of legitimate governmental interests.” Doe v. Heck, 327 F.3d 492, 510 (7th Cir. 2003) (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). And the reasonableness of a search or seizure will depend on the context in which the search or seizure takes place. T.L.O., 469 U.S. at 337. ¶ 15 Under T.L.O., determining the reasonableness of a school search involves a twofold inquiry. A school search is reasonable if it is (1) justified at its inception and (2) conducted in a manner “reasonably related in scope to the circumstances which justified the interference in the first place.” Id. at 341 (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). Our supreme court in P.E.A. adopted T.L.O.’s reasonableness standard and test in the context of school searches. P.E.A., 754 P.2d at 386. ¶ 16 The T.L.O. Court, however, left open the question of how or whether the reasonableness standard should also apply to seizures or detentions of students by school officials. Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 148 (3d Cir. 2005). In P.E.A., while addressing and adopting the T.L.O. standard for searches, the supreme court did not need to confront the standard for seizures and detention of students by school officials. 
8 ¶ 17 In the context of school seizures, some state courts have applied a more lenient standard, sanctioning detentions of students as long as the detentions were not arbitrary, capricious, or for the purposes of harassment. See, e.g., In re K.J., 227 Cal. Rptr. 3d 380, 385 (Ct. App. 2018). The consensus among federal circuit courts, though, is that the T.L.O. reasonableness standard should also apply to school seizures. Shuman, 422 F.3d at 148 (collecting cases). ¶ 18 We recognize that students do not “shed their constitutional rights . . . at the schoolhouse gate,” Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969), and the “nature of those rights is what is appropriate for children in school,” Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656 (1995). Accordingly, we join the federal courts in adopting the T.L.O. reasonableness standard to evaluate whether a student was detained in violation of the student’s Fourth Amendment rights. See Doe ex rel. Doe v. Haw. Dep’t of Educ., 334 F.3d 906, 909 (9th Cir. 2003); Hassan v. Lubbock Indep. Sch. Dist., 55 F.3d 1075, 1079 (5th Cir. 1995); Edwards ex rel. Edwards v. Rees, 883 F.2d 882, 884 (10th Cir. 1989). 
9 B. Anonymous, Uncorroborated, Stale Safe2Tell Tip ¶ 19 The search of a student’s property is justified at its inception if there are “reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.” T.L.O., 469 U.S. at 341-42; see also Edwards, 883 F.2d at 884. That means a school officer must have a particularized and objective basis for suspecting legal wrongdoing. See United States v. Arvizu, 534 U.S. 266, 273 (2002). 1. Anonymous, Unsubstantiated Tips ¶ 20 Reasonable suspicion for a search must be based on specific and articulable facts known to the officer and the rational inferences drawn from those facts. People v. George, 914 P.2d 367-69 (Colo. 1996). In other contexts, our courts have recognized that “[s]tanding alone, an anonymous tip lacks the ‘indicia of reliability sufficient to establish reasonable suspicion.’” People v. D.F., 933 P.2d 9, 12 (Colo. 1997) (quoting People v. Garcia, 789 P.2d 190, 192 (Colo. 1990)); see also Alabama v. White, 496 U.S. 325, 329 (1990) (“[A]n anonymous tip alone seldom demonstrates the informant’s basis of knowledge or veracity,” and therefore seldom 
10 supplies a basis for reasonable suspicion.); People v. Martinez, 200 P.3d 1053, 1057-58 (Colo. 2009). ¶ 21 Nevertheless, the General Assembly created the Safe2Tell program predicated on the reporting of anonymous tips by students and others. See § 24-31-606(2)(a), C.R.S. 2020. The Safe2Tell program safeguards the anonymity of its tipsters by design; the legislative declaration explains that anonymous reporting before potentially harmful or criminal activity has occurred is “critical in reducing, responding to, and recovering from these types of events in schools.” § 24-31-602(1)(b), C.R.S. 2020. According to the most recent Safe2Tell Annual Report, “[t]he program promotes early intervention by serving as a conduit of information between tipsters and local multidisciplinary teams, which are comprised of caring adults in community organizations such as schools and law enforcement agencies.” Office of the Attorney General, Safe2Tell Annual Report 3 (Aug. 1, 2019-July 31, 2020), https://perma.cc/4NRG-G7C6. In the 2019-2020 school year, the Safe2Tell program received 20,822 tips of different types, including suicide threats, self-harm, child abuse, and cyberbullying. Id. at 5. 
11 Only 1.5% of the tips (313 out of 20,822) concerned guns. Id. at 11-12. ¶ 22 Testifying at the suppression hearing, the school safety officer explained that when he receives a Safe2Tell tip, there is no way to determine who made the tip, or even whether it was made by a student, parent, or staff member. ¶ 23 In its ruling denying C.C-S.’s motion to suppress, the trial court expressed concern about the anonymity of the Safe2Tell program, particularly that the program “is so open and anonymous” as to create the possibility of “one student harassing another by posting false anonymous tips.” See id. at 5-6 (discussing the number of false tips and how Safe2Tell handles them). Because the tip regarding C.C-S. was based on an automatically disappearing Snapchat video and because the person receiving the tip apparently did not or could not inquire as to whether the video had been saved, no one involved in the investigation was able to view it. The court indicated that it would have been more skeptical as to whether the search was supported by reasonable suspicion if it was based on the anonymous Safe2Tell tip alone. However, the court concluded that the reasonableness of the search was supported by the 
12 combination of the Safe2Tell tip and the dean’s comment that C.C-S. “has a history of bringing things to school that he shouldn’t.” ¶ 24 Reasonable suspicion exists when facts known to a police officer, together with rational inferences from those facts, create a reasonable and articulable suspicion of criminal activity, which justifies an intrusion into the defendant’s personal privacy at the time of the stop. People v. Martin, 2014 COA 112, ¶ 21, 338 P.3d 1106, 1114. Factors the police may consider include the lateness of the hour, the character of the area, a person’s reactions to the presence of police, whether a companion is being arrested, and a person’s nervous or unduly cautious behavior. Id. at ¶ 22, 338 P.3d at 1114. ¶ 25 An anonymous and otherwise unreliable tip may furnish reasonable suspicion sufficient to justify a search if verified by enough independent corroborating evidence of a violation of the law or school rules. See People v. Salazar, 964 P.2d 502, 505 (Colo. 1998) (“[I]nformation supplied by an anonymous source ‘may warrant an investigatory stop only if it is verified by sufficient independent corroborating evidence of criminal activity.’” (quoting George, 914 P.2d at 370)). 
13 ¶ 26 We are not persuaded by the People’s contention that because anonymity is the “linchpin” of the Safe2Tell program, an anonymous tip generally suffices to support the search of a student. Although anonymous tips may deter crime or reduce incidents of school violence, the anonymity of tips received by the Safe2Tell program does not ensure, without more, that such tips will provide reasonable suspicion as required by the Fourth Amendment. In each case, a court must balance the anonymity of a tip, its specificity, whether it is stale, and other evidence to determine whether the reasonable suspicion test has been satisfied. ¶ 27 Under the circumstances of this case, therefore, we conclude that the Safe2Tell tip was insufficient to provide reasonable suspicion. We reach this conclusion for four reasons. First, as noted above, the tip was anonymous. Second, the information provided in the tip was stale. Third, because it was anonymous and stale, the limited information in the Safe2Tell tip did not provide reasonable suspicion that C.C-S. had committed or was about to 
14 commit a crime.2 And, fourth, the information about C.C-S.’s past behavior at school did not corroborate the Safe2Tell weapons tip. 2. Stale Tips ¶ 28 As noted above, the information provided by the tipster here was deficient, in large part, because it was stale. See United States v. Payne, 181 F.3d 781, 789 (6th Cir. 1999) (An anonymous, stale tip “was clearly insufficient to create a reasonable suspicion” to support a search.). While staleness is a concept typically associated with a probable cause inquiry, the “staleness doctrine also applies to reasonable suspicion.” United States v. Touset, 890 F.3d 1227, 1238 (11th Cir. 2018). ¶ 29 Accordingly, the Safe2Tell tip was problematic because it was based on a month-old Snapchat video that was not reviewed by anyone involved in the investigation due to it being automatically deleted. ¶ 30 A tip is less supportive of reasonable suspicion after it has gone stale. See id.; United States v. Gonzalez, 190 F.3d 668, 673 (5th Cir. 1999). There is no time limit that determines when 2 For example, the anonymous tip did not indicate whether C.C-S. had the weapon near or on school property. 
15 information becomes stale. Whether information is stale depends on the factual circumstances and the type of crime. People v. Miller, 75 P.3d 1108, 1113 (Colo. 2003); see also United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000). Factors to be considered include whether the criminal activity was a discrete incident or whether it is likely to be ongoing, see United States v. Laughrin, 438 F.3d 1245, 1247-48 (10th Cir. 2006), and whether the evidence of the crime is likely to be kept or whether it is disposable or often transferred, see Payne, 181 F.3d at 790. ¶ 31 For example, the Miller court concluded that information contained in a police affidavit to support a search warrant was stale because it was nearly a month old when the police applied for a warrant. 75 P.3d at 1111. However, courts assume that evidence of child pornography is rarely disposed of, and thus ongoing. See Touset, 890 F.3d at 1238 (collecting cases). As a result, a tip relating to such electronic images will remain fresh for longer than, for example, evidence of drug trafficking, which by its nature is a crime where the evidence is frequently transferred or consumed. See Payne, 181 F.3d at 790 (“Drugs are not the types of objects that are likely to be kept.”). 
16 ¶ 32 In contrast, in Commonwealth v. Watkins, 156 N.E.3d 235, 239 (Mass. App. Ct. 2020), the court rejected the defendant’s argument that images on Snapchat were stale because they were undated and could have been taken well before they were uploaded to Snapchat. The court concluded that an informant’s statement in a Snapchat video provided evidence that the Snapchat image was taken contemporaneously with its posting. ¶ 33 Gonzalez is instructive as to when older information may not be stale when it rejected the argument that a tip received almost two months earlier was stale. 190 F.3d at 673. The court reasoned that evidence of an ongoing pattern of criminal activity may justify reliance on older information from an informant than when an informant provides information about criminal conduct expected to recur. Id. Therefore, the court held, officers were justified in conducting a Terry stop of the defendant’s vehicle, see 392 U.S.1, to look for evidence of the activity. Gonzalez, 190 F.3d at 673. ¶ 34 Here, the Safe2Tell tip provided no information about the Snapchat video’s source and indicated that it had been taken a month earlier. Further, the Safe2Tell tip about the Snapchat video gave no indication that C.C-S. would continue to carry a gun on his 
17 person, or that he could be expected to have one in his backpack (or worse, use it) at school at some future date. ¶ 35 Although the People rely on M.D. v. State, 65 So. 3d 563, 564 (Fla. Dist. Ct. App. 2011), we conclude that case is distinguishable. That court concluded that there was reasonable suspicion to detain and question a student based on an anonymous tip that the student had carried a gun onto campus three months earlier. Here, in contrast and as mentioned above, the anonymous tip did not indicate that C.C-S. had carried a gun onto campus or that he intended to do so. ¶ 36 Nevertheless, we recognize the concerns of the M.D. court that “[a]llegations of gun possession on school campuses are different from traditional Fourth Amendment cases. Many courts have recognized these cases are unique because of the seriousness of the threat, the location of the threat, the vulnerability and number of potential victims, and the lessened expectation of privacy of students.” Id. at 565. Consequently, in circumstances different from those presented here, an anonymous tip involving a student’s possession of a gun — even if uncorroborated — may be found to 
18 satisfy the reasonableness standard to justify a detention and search of a student. ¶ 37 However, when, as here, a stale tip does not provide reasonable suspicion to justify the search of a student, the mere allegation of gun possession does not justify a search of that student. 3. C.C-S.’s Past Behavior ¶ 38 The dean’s description of C.C-S.’s past behavior revealed only that C.C-S. had a history of “bringing things to school that he shouldn’t, such as drugs and things like that.” Under T.L.O., the relevant inquiry is whether the officer had reasonable suspicion that searching the student would turn up evidence of criminal or prohibited behavior. 469 U.S. at 341-42. That C.C-S. brought drugs to school in the past is not an objective, particularized basis for suspecting that a search of C.C-S.’s backpack would reveal evidence of a weapon. See Arvizu, 534 U.S. at 273. A defendant’s past criminal conduct does not by itself give rise to reasonable suspicion of present criminal activity. United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994) (report about defendant’s prior involvement in hit-and-run incident and prior arrest for narcotics 
19 violation insufficient to give rise to reasonable suspicion for continued detention in patrol car); United States v. Santillanes, 848 F.2d 1103, 1108 (10th Cir. 1988) (detective lacked reasonable suspicion to detain defendant based on prior arrest and observation that defendant veered away from detective at an increased pace upon seeing him); see also People v. Padgett, 932 P.2d 810, 814 (Colo. 1997) (reasonable suspicion may not be based solely on the reputation of past criminal activity in a locality); People v. McKnight, 2017 COA 93, ¶ 23, 452 P.3d 82, 87 (reasonable suspicion may not be based on evidence that defendant’s passenger had used methamphetamine “at some point in the past”), aff’d, 2019 CO 36, 446 P.3d 397. ¶ 39 In some instances, however, the nature of a defendant’s past criminal conduct makes it a reliable predictor that the defendant will behave in the same way again. In United States v. Daoust, 916 F.2d 757 (1st Cir. 1990), for example, the court found that the officers had reasonable suspicion to suspect that their safety was at risk when they arrived at the defendant’s house at 7 a.m., a time when he would likely be home sleeping, and they knew that he had a prior criminal history of violent behavior and kept a handgun in 
20 an “unusual” place in the kitchen. Id. at 759. Similarly, the Fifth Circuit held in United States v. Gordon, 722 F.2d 112, 114 (5th Cir. 1983), that the officers had reasonable suspicion that the occupants of a motor home were engaged in criminal activity because the motor home was registered to the same address as another motor home that had been seized in a prior marijuana arrest and one of the occupants they had identified was a member of a marijuana smuggling group known to use motor homes for its smuggling activities. ¶ 40 Here, in contrast, the dean’s description of C.C-S.’s past behavior was unrelated to the Safe2Tell tip. The dean told the school security officer that C.C-S. had previously brought drugs to school, not firearms. C.C-S.’s history of bringing drugs to school was not a reliable predictor that he would have brought a weapon to school on the day he was searched. The dean’s description of C.C-S.’s history therefore did not corroborate the anonymous Safe2Tell tip but at best served as an alternate justification for the search. ¶ 41 Thus, when the school security officer decided to search C.C-S.’s backpack, his suspicion of criminal activity was based at 
21 most on a stale Safe2Tell tip founded on a Snapchat video that was no longer accessible and C.C-S.’s alleged prior behavior. Taken together, these factors were insufficient to provide reasonable suspicion to search C.C-S.’s backpack. See Sandoval, 29 F.3d at 542 (prior criminal history); D.F., 933 P.2d at 12 (anonymous tip). ¶ 42 In its ruling upholding the search, the trial court suggested that its hands were tied by the supreme court’s holding in P.E.A. We conclude that P.E.A. is distinguishable. ¶ 43 P.E.A. also involved a school search, which the supreme court found was justified at its inception. However, the school officials in that case acted on more substantial and reliable evidence of wrongdoing than the DPS officers had against C.C-S. There, an officer was told by a student that two other students had stolen marijuana from a backyard and had taken it to a local high school that morning to sell to students. 754 P.2d at 384. After a search of those students by school officials (a principal and a school security officer) produced no evidence of drugs or other contraband, the students were asked how they came to school that day, and one student revealed that P.E.A. had driven the other student to school. 
22 Id. After a search of P.E.A. failed to uncover any drugs, a school security officer searched his car and found marijuana. ¶ 44 In the trial court’s view, the search upheld in P.E.A. was based on less reliable information than the search of C.C-S. We disagree. ¶ 45 Unlike the circumstances here, the search in P.E.A. was initiated after a tip from an identified student made in person to an officer that two students had taken marijuana to a local high school that morning, making the information neither anonymous nor stale as was the case for the Safe2Tell tip. We therefore do not agree with the trial court that the search of C.C-S. was based on more reliable information than the search in P.E.A., and thus that decision does not require that we uphold the search of C.C-S. 4. Nature of Safe2Tell Program ¶ 46 The People argue that we should give special consideration to the nature of the Safe2Tell program, which is designed to promote anonymous tips about violent or otherwise harmful behavior at schools. While we recognize the importance of Safe2Tell’s role in preventing school violence, investigations based on Safe2Tell tips by DPS security officers and other school officials must occur within the bounds of students’ Fourth Amendment rights. Cf. People v. 
23 Dandrea, 736 P.2d 1211, 1215 (Colo. 1987) (“[W]e must make every effort to construe the statute in a manner that does not violate constitutional limits.”). Therefore, we conclude that the Safe2Tell statutes do not provide unbridled discretion to school security officers and other school officials to search students’ backpacks. ¶ 47 Based on the circumstances here, we conclude the investigation undertaken simply did not produce evidence amounting to reasonable suspicion to search C.C-S. and, further, was impermissibly based on stale information. C. Unlawful Detention ¶ 48 Alternatively, the People ask us to uphold the search on an additional basis not raised in or considered by the trial court — that C.C-S. admitted to the officers that he had drugs in his backpack, an admission that the People argue provided the officers with reasonable suspicion to perform the search. We consider this contention because we may affirm a trial court’s decision for any reason, including one not considered by the trial court. Red Flower, Inc. v. McKown, 2016 COA 160, ¶ 58, 411 P.3d 1094, 1104; cf. People v. Morehead, 2019 CO 48, ¶ 15, 442 P.3d 413, 418 (supreme court has frequently declined to address arguments against 
24 suppression raised for the first time on appeal). However, we are not persuaded by this contention. ¶ 49 Because it is undisputed that C.C-S. was not free to leave the dean’s office, as noted above, he had been seized for Fourth Amendment purposes when he admitted he had marijuana in his backpack. See Shuman, 422 F.3d at 147 (student was seized when he was told to remain in the school conference room and was not free to leave). ¶ 50 As we have discussed, a seizure is justified at its inception if school officials have a reasonable basis to believe that a student has violated the law or a school rule.3 Wofford v. Evans, 390 F.3d 318, 327 (4th Cir. 2004). For the same reasons we have concluded that the search of C.C-S.’s backpack violated his Fourth Amendment rights, we conclude that the seizure of C.C-S. was similarly not supported by reasonable suspicion. See People v. Kline, 824 N.E.2d 295, 301 (Ill. App. Ct. 2005) (school officials did not have reasonable suspicion to detain student based on anonymous tip 3 We do not mean to suggest that school officials cannot compel students to go to the principal’s office. They can if they have a legitimate school policy reason for doing so. 
25 that student possessed marijuana in his pants pocket because the tip did not provide any details that the officials could have verified before the seizure, the officials did not observe a bulge in the student’s pocket, and the student was not acting suspiciously). ¶ 51 Accordingly, we conclude that the uncorroborated Safe2Tell tip did not justify detaining C.C-S. Because he was unreasonably detained, we may not rely on his admissions made during that unlawful detention to uphold the search of his backpack. IV. Exclusionary Rule ¶ 52 Finally, the People argue that even if the search and seizure were unlawful, the adjudication of delinquency can still be affirmed because we should determine that the exclusionary rule should not apply to searches of a student conducted by a school official. We disagree. A. Standard of Review and Applicable Law ¶ 53 Ordinarily, evidence obtained in violation of the Fourth Amendment is not admissible in a criminal proceeding against the victim of an illegal search or seizure. People v. Tomaske, 2019 CO 35, ¶ 10, 440 P.3d 444, 447. The rule has been applied to juvenile delinquency proceedings. People in Interest of K.D.W., 2020 COA 
26 110, ¶ 18, 471 P.3d 1276, 1280-81. The exclusionary rule is a judicially created remedy for deterring illegal searches and seizures. Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 363 (1998). It is intended “to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.” Elkins v. United States, 364 U.S. 206, 217 (1960). ¶ 54 Nevertheless, the Colorado Supreme Court has cautioned that the exclusionary rule “should not automatically apply every time a Fourth Amendment violation is found . . . .” Casillas v. People, 2018 CO 78M, ¶ 21, 427 P.3d 804, 810 (quoting People v. Gutierrez, 222 P.3d 925, 941 (Colo. 2009)). The court explained that [b]ecause the exclusionary rule “serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence,” to warrant its application, law enforcement conduct must be “sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” Id. at ¶ 22, 427 P.3d at 810 (quoting Herring v. United States, 555 U.S. 135, 144 (2009)). ¶ 55 The T.L.O. Court left open the question of whether the exclusionary rule applies in school searches. 469 U.S. at 332 n.3; 
27 Shuman, 422 F.3d at 148. No published Colorado decision has addressed whether the exclusionary rule applies to unlawful searches by school officials. See P.E.A., 754 P.2d at 384 n.1 (because the search was reasonable, the court did not need to determine whether the exclusionary rule applies to unlawful searches by school officials). More specifically, the issue is whether the rule applies only to searches and seizures by law enforcement officers or whether it extends to the actions of school officials. ¶ 56 Decisions of state courts in other jurisdictions, by a clear majority, have applied the exclusionary rule to actions of school officials. See G.M. v. State, 142 So.3d 823, 829 (Ala. 2013) (applying exclusionary rule to search conducted by principal); Gordon J. v. Santa Ana Unified Sch. Dist., 208 Cal. Rptr. 657, 665 (Ct. App. 1984) (“[T]he exclusionary rule is fully available in criminal prosecutions and juvenile proceedings with respect to evidence illegally obtained by high school officials . . . .”); T.S. v. State, 863 N.E.2d 362, 367 (Ind. Ct. App. 2007) (“[T]he decisions of Indiana courts subsequent to T.L.O. indicate that the exclusionary rule is the remedy for Fourth Amendment violations occurring in schools.”); State v. Mora, 307 So. 2d 317, 320 (La.) (applying 
28 exclusionary rule to search conducted by teacher and principal), cert. granted, judgment vacated, and case remanded, 423 U.S. 809 (1975); People v. Scott D., 315 N.E.2d 466, 471 (N.Y. 1974) (applying exclusionary rule to search conducted by teacher who was also school coordinator of security); In Interest of L.L., 280 N.W.2d 343, 346-47 (Wis. Ct. App. 1979) (exclusionary rule applies to all school searches and seizures). But see State v. Young, 216 S.E.2d 586, 591 (Ga. 1975) (holding that there was no Fourth Amendment violation, but if there were, exclusionary rule would not apply to searches by school officials). B. Analysis ¶ 57 We conclude that applying the exclusionary rule in school searches conducted by DPS security officers would deter Fourth Amendment violations. Those security officers perform quasi-law enforcement functions, inasmuch as the evidence they collect is often used in juvenile delinquency adjudications such as this one. As T.L.O. noted, the Supreme Court has never limited the prohibition against unreasonable searches and seizures to operations conducted by the police. Rather, the Court has applied the Fourth Amendment to governmental action. See T.L.O., 469 
29 U.S. at 335. To apply the Fourth Amendment’s exclusionary rule to school searches is therefore a logical extension of Supreme Court precedent. Its application here is especially appropriate since school security officers, whether acting in concert with the police or not, are governmental actors. ¶ 58 In reaching this conclusion, we necessarily reject the People’s contention that even if the search of C.C-S. was invalid, reversal is not warranted. Relying on Herring, 555 U.S. at 140, the People assert that the primary purpose of the exclusionary rule is to deter police misconduct. Because the conduct at issue here was that of a school security officer, rather than the police, the People argue that there would be no deterrent effect here from applying the exclusionary rule. We disagree for four reasons. ¶ 59 First, in Herring, the Supreme Court declined to apply the exclusionary rule because the police conduct was akin to a “recordkeeping error” which indicated negligence rather than deliberate action. Id. at 144-46. Here, the DPS officer testified that he searches every student who is the subject of an anonymous tip (and sometimes the tipsters, too). In this case, he physically prevented C.C-S. from leaving the office based on a mere hunch 
30 that he might be carrying contraband in his backpack. That conduct is sufficiently deliberate to warrant application of the exclusionary rule. See id. ¶ 60 We conclude that applying the exclusionary rule here can meaningfully deter conduct by school officials in violation of the Fourth Amendment. We have already noted that a more relaxed standard of reasonable suspicion may apply when school officials investigate allegations involving guns. Thus, in many such cases, school officials whose conduct is challenged will be found to have acted based on reasonable suspicion. In other cases, like the circumstances presented here, school officials will be deterred from referring cases to the police when stale evidence is based on an anonymous tip. Accordingly, even if school officials feel compelled to investigate every tip involving alleged use or possession of guns, they will be deterred in referring such cases to the police unless they have reasonable suspicion to do so. ¶ 61 Second, our supreme court has never limited the application of the exclusionary rule to violations committed by police officers. A division of this court recently applied the rule to exclude evidence unlawfully obtained by caseworkers employed by the Department of 
31 Human Services. See People v. Dyer, 2019 COA 161, ¶¶ 28-30, 457 P.3d 783, 790. Additionally, as with the juvenile probation officers in Casillas, school security officers in this case are similar to “adjuncts to the law enforcement team” when they refer cases to law enforcement officials. Casillas, ¶ 27, 427 P.3d at 811. ¶ 62 Third, the Safe2Tell program functions analogously to other law enforcement programs. The program’s authorizing statute indicates that both law enforcement officers and school officials are responsible for implementing the program. See § 24-31-606(2)(c), (e), (f), (n). The tip in this case was apparently forwarded from a law enforcement dispatch center to the DPS officer and the school officials. ¶ 63 Finally, the unlawfully obtained evidence was used in a delinquency proceeding, where there is persuasive reason to apply the exclusionary rule. There are some contexts in which the deterrent value of the exclusionary rule is too slight to require that evidence obtained in violation of the Fourth Amendment be suppressed. See, e.g., People in Interest of A.E.L., 181 P.3d 1186, 1192 (Colo. App. 2008) (declining to apply exclusionary rule in context of a dependency and neglect case). “Criminal proceedings 
32 are, of course, the realm in which the exclusionary rule is strongest.” Payne, 181 F.3d at 788. ¶ 64 We therefore conclude that applying the rule to searches and seizures conducted by DPS security officers who later refer information of suspected criminal activity to the police would serve to deter Fourth Amendment violations. The DPS officers’ search and seizure led to C.C-S.’s arrest and adjudication. ¶ 65 Even if the People correctly assert that the school security officer and the dean were primarily concerned about school safety, they were also concerned about any appropriate punishment for C.C-S. Thus, any discovery of a weapon on C.C-S. or in his backpack would likely have led to the filing of delinquency proceedings. (Indeed, as we have already noted, the discovery of marijuana and marijuana paraphernalia led to the filing of this action.) ¶ 66 Under these circumstances, we conclude that the exclusionary rule should apply in the context of searches and seizures of students by school officials. ¶ 67 We reject the People’s argument that because school officials were acting on a tip from the Safe2Tell program and were required 
33 to investigate, their actions were insulated from the application of the exclusionary rule. As noted above, although we understand the value of the Safe2Tell program, school officials must still comply with the Fourth Amendment. No provision of the Safe2Tell program required school officials to search C.C-S. based on the month-old information in their possession or to report C.C-S. to law enforcement officials. ¶ 68 Finally, even if the detention of C.C-S. was unlawful, the People contend that the search of C.C-S.’s backpack was lawful under the attenuation exception to the fruit of the poisonous tree doctrine. We disagree. ¶ 69 “Evidence of a crime that is derived from evidence discovered through illegal police activity may be suppressed under the fruit-of-
the-poisonous-tree doctrine.” Perez v. People, 231 P.3d 957, 962 (Colo. 2010). This includes confessions that are fruit of an illegal detention. Id. ¶ 70 Although statements made during an unlawful detention may nevertheless be admissible “if the connection between the illegal action and the derivative evidence is attenuated such that the derivative evidence is ‘sufficiently distinguishable to be purged of 
34 the primary taint,’” id. (quoting Wong Sun v. United States, 371 U.S.
471, 488 (1963)), the People argue only that C.C-S. was not unlawfully detained under T.L.O. We disagree. ¶ 71 The question is whether the contested evidence “has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Wong Sun, 371 U.S. at 488 (citation omitted). ¶ 72 Because we conclude that C.C-S.’s admission was the fruit of an unlawful detention and the discovery of the marijuana was not sufficiently attenuated so as to dissipate the taint of the constitutional violation, we may not rely on his admission as justification for the DPS security officer’s otherwise illegal search. ¶ 73 Breaking the causal chain would require a showing that C.C-S.’s admission was an act of free will and not a product of his detention. People v. Lewis, 975 P.2d 160, 173 (Colo. 1999). Such a showing is not supported by the record. The DPS officer’s testimony established that C.C-S. repeatedly refused to consent to a search of his backpack, attempted to leave the office several times, and did not admit to possessing marijuana until after the DPS 
35 officer had made clear that C.C-S. would not be free to leave until he and the campus security officer has searched the backpack. V. Conclusion ¶ 74 The judgement is reversed and case remanded for a new trial. JUDGE DAILEY and JUDGE JOHNSON concur.